STRINE, Chief Justice,
concurring in the Majority per curiam, with whom Justice HOLLAND and Justice SEITZ join:
I.
I join with a majority of my colleagues in concluding that Delaware’s current death penalty statute conflicts with the Sixth Amendment of the United States Constitution. The importance and complexity of the subject before us is illustrated by *435 the somewhat different ways that each of us approach how the questions put to us should be answered and why they should be answered “yes,” “no,” or not answered in part. I agree with the succinct answers given to the five certified questions before us in the Majority’s per curiam, opinion, in which I happily and fully join. The questions posed involve the application of a fundamental constitutional right that is easy to state — the right to a trial by a jury — but that has been the subject of complex judicial explication during the past forty-four years since Furman v. Georgia[1] made the administration of the death penalty a constant subject of federal constitutional rulings. Given these decisions and the compelling importance of the subjects we now must address, I therefore burden the interested reader with an explanation of how I reached the answers I did. The core of my reasoning, however, is as follows.
Distilled to their essence, the most critical of questions before us ask whether the Sixth Amendment requires a jury, rather than a judge, to make all of the factual findings in capital sentencing — including balancing those factors for itself in assessing whether death is the appropriate punishment — and, if so, whether the jury must make such findings unanimously and beyond a reasonable doubt. Although I acknowledge that the meaning of Hurst v. Florida[2] is contestable, it states that “[t]he Sixth Amendment requires a jury, not a judge, to find each fact necessary to impose a sentence of death.”[3] A combination of settled U.S. Supreme Court cases makes it impossible for a state to enact a statute under which a defendant must receive the death penalty if he is convicted. Rather, even if a jury unanimously finds that a defendant is guilty of a crime that is punishable by death — by for example, finding that a defendant has committed a particular type of murder for which the legislature has said death is a possible penalty — additional findings must be made. To sentence a defendant to death, the sentencing authority must consider all relevant factors bearing on whether the defendant should live or die, weigh those factors rationally against each other, and make an ultimate determination of whether the defendant should die or receive a comparatively more merciful sentence, typically life in.prison. The option for the sentencing authority to give a prison sentence, rather than a death sentence, must always exist. After consideration of these factors and a determination that the balance of the relevant factors weighs in favor of a death sentence, the defendant cannot receive a death sentence.
For these reasons, if the core reasoning of Hurst is that a jury, rather than a judge must make all the factual findings “necessary” for a defendant to receive a death sentence,[4] then Delaware’s statute cannot stand. Because our General Assembly has acted with alacrity to address the mandates of the U.S. Supreme Court, our statute necessarily mandates a fact-intensive inquiry at the ultimate stage of sentencing, in which the factors that aggravate toward a death sentence and mitigate against it are considered and weighed. This application of the sentencing authority’s judgment, conscience, and experience to the facts of record is what drives the ultimate decision whether the defendant should live or die. Without that exercise, no defendant *436 can receive a death sentence consistent with the principles established by U.S. Supreme Court cases pre-dating Hurst.
I recognize that this reading of Hurst is contestable, and that Hurst can be read as simply reiterating that any factual finding that makes a defendant eligible to receive the death penalty must be made by the jury. Under that approach, once a jury has done all that is 'statutorily required to make death a permissible punishment, the jury’s constitutionally required role goes away entirely and the use of a jury at all is optional. Past case law, whose reasoning is in sharp tension with the central reasoning of Hurst and its predecessors such as Ap-prendi v. New Jersey,[5] embraces this narrow approach.
For myself, however, I find it impossible to embrace a reading of Hurst that judicially draws a limit to the right to a jury in the death penalty context to having the jury make only the determinations necessary to make the defendant eligible to be sentenced to death by someone else, rather than to make the determinations itself that must be made if the defendant is in fact to receive a death sentence. I am unable to discern in the Sixth Amendment any dividing line between the decision that someone is eligible for death and the decision that he should in fact die. The post-Furman jurisprudence has created a regime governing death penalty cases that is intricate in design and often in tension with itself. Candor requires an acknowledgment that that jurisprudence, although no doubt well-intended, has helped impel a reduction in the historical role of American juries in the death sentencing process in a small number of states, including our own.
At the beginning of our Republic and throughout most of its history, defendants did not go to the gallows unless juries said they should. And the role of the jury was seen as especially important when a defendant’s life was in the balance, because it made sure that a defendant would suffer the ultimate punishment only if twelve members of the community deliberated together and unanimously concluded that should be so. To me, Hurst and its predecessors surface a reality that had been somewhat obscured in the development of the law in the decades since Furman, which is that the Sixth Amendment right to a jury is most important and fundamental when the issue is whether a defendant should live or die. As the U.S. Supreme Court has long recognized, death is different. The proposition that any defendant should go to his death without a jury of his peers deciding that should happen would have been alien to the Founders, and starkly out of keeping with predominant American practices as of the time of Fur-man itself. The cost of useful precedent mandating that each defendant who commits a capital offense must also be accorded a rational sentencing proceeding that must include a careful consideration of those factors weighing in favor of mercy does not have to include depriving the defendant of the fundamental protection of a jury having to make the final judgment about his fate. If the right to a jury means anything, it means the right to have a jury drawn from the community and acting as a proxy for its diverse views and mores, rather than one judge, make the awful decision whether the defendant should live or die.
I therefore give Hurst its plain meaning and concur in the per curiam opinion’s answers to the questions before us. Under our statute that faithfully respects the requirement to consider all relevant sentencing factors and allow a death penalty only after those factors are *437 weighed and the option for mercy is considered, findings beyond the eligibility stage are necessary if a defendant is. to receive a death sentence. Thus, our statute cannot stand. And to put my opinion in more basic terms, I embrace the notion that the Sixth Amendment right to a jury extends to all phases of a death penalty case, and specifically to the ultimate sentencing determination of whether a defendant should live or die. Although states may give judges a role in tempering the harshness of a jury or in ensuring proportionality, they may not execute a defendant unless a jury has unanimously recommended that the defendant should suffer that fate.
I also note that this same result can be reached by a more oblique and alternative route, which is holding that the practice of executing a defendant without the prior unanimous vote of a jury is so out of keeping with our history as to render the resulting punishment cruel and unusual. The jury’s historical role as an important sáfeguard against overreaching in this most critical of contexts was recognized at the founding, and prevails in most states today, making our own state one of the few outliers. Hurst recognizes the centrality of the jury’s historic role, and my opinion gives effect to that recognition.
Consistent with this reasoning, I also conclude that the Delaware death penalty statute is inconsistent with the Sixth Amendment .to the extent that it does not require a unanimous jury to make the key discretionary findings necessary to impose a death sentence by employing a beyond a reasonable .doubt standard. From the inception of our Republic, the unanimity requirement and the beyond a reasonable doubt standard have been'integral to the jury’s role in ensuring that no defendant should suffer death unless a cross section of the community unanimously determines that should be the case, under a standard that requires them to have a high degree of confidence that, execution is the just result.
II.
To explain how I address the certified questions and the U.S. Supreme Court cases that occasion the certified questions before us, it is critical to understand, at least in rough outline, how we as a nation and state got to where we are in the administration of the death penalty, and how different things look from when our nation was founded. By necessity, my recitation of this process is truncated, involves some simplification of a very complicated subject, and is compromised by the reality that I am a judge, and do not claim to be a historian. That said, I am aided by the many scholars and lay commentators who have lucidly outlined the basic directional facts.[6]
At the beginning of our Republic, prisons of the kind we now have, where many defendants spend lengthy periods of their lives, were unknown.[7] Instead, nearly all *438 felonies earned mandatory death sentences,[8] as was traditional in England — the primary example upon which our criminal justice system was built.[9] Because of greater American antipathy toward the death penalty, however, American criminal statutes had already begun to narrow the long list of crimes for which death was the mandatory sentence.[10] For example, in the 1790s, Pennsylvania became the first state “to alleviate the undue severity of the law by confining the mandatory death penalty to ‘murder of the first degree,’ ”[11] a trend that would gain momentum.[12]
From the beginning of our nation’s history, the jury’s role as the sentencer in capital cases “was unquestioned.”[13] This was true in Delaware, where juries made the life or death decision at the beginning of our history.[14] And, without any exception I have been able to identify, no defendant was put to death in the early stages of our nation’s history without a jury making all the necessary determinations required.[15] Of course, it is a bit of a misnomer to say that juries “sentenced” defendants to death. Capital trials were not bifurcated, and “[t]he question of guilt and the question of death both were decided in a single jury verdict at the end of a single proceeding conducted as an adversarial trial.”[16] But, it would be even more inaccurate to say that the jury did not have an important role in exercising its discretion and conscience in a manner that determined whether the defendant should live or die.
The starkest way in which juries did this was by acquitting a defendant who was obviously guilty.[17] By this crude action of *439 nullification, a jury could exercise its conscience by refusing to convict a guilty defendant precisely because the jury thought that death was too harsh a punishment for the crime. Rather than this practice of nullification leading to hostility to juries by our founding generation, it was seen as an example of the bedrock importance of the jury in securing the liberties of our citizens.[18] John Adams, for example, wrote: “It is not only [the juror’s] right, but his duty ... to find the verdict according to his own best understanding, judgment, and conscience, though in direct opposition to the direction of the court.”[19]
The practice of nullification also exposed an important community viewpoint that statute writers began to recognize, which is that crimes could be serious but yet not be considered so injurious to society as to always warrant a death sentence. Therefore, as Pennsylvania had done, states increasingly narrowed the felonies for which death was a mandatory sentence.[20] Degrees of murder were in large measure introduced to allow juries to convict a defendant of a degree of homicide while not exposing the defendant to death. And over time, jury discretion over sentencing was more candidly introduced, as several states moved to statutory regimes under which even a defendant convicted of the most serious of crimes — such as intentional murder — could nonetheless be given a sentence other than death. In the 1830s and 40s, the first states abandoned mandatory death sentences even in first degree murder cases and granted juries discretion in capital sentencing.[21] Our own General Assembly divided murder into two degrees in 1852, with first degree murder carrying a mandatory death sentence and second degree murder carrying various harsh, non-capital sentences.[22] This gave the jury an option to convict, but to exempt the defendant from death if its sense of mercy moved in that direction.[23]
About half of the states adopted discretionary statutes by 1900, and even more states followed soon after.[24] In 1899, the U.S. Supreme Court itself well-summarized some of the key developments:
The hardship of punishing with death every crime coming within the definition of murder at common law, and the reluctance of jurors to concur in a capital conviction, have induced American legislatures, in modern times, to allow some cases of murder to be punished by imprisonment, instead of by death. That end has been generally attained in one of two ways: First. In some states and *440 territories, statutes have been passed establishing degrees of the crime of murder, requiring the degree of murder to be found by the jury, and providing that the courts shall pass sentence of death in those cases only in which the jury return a verdict of guilty of murder in the first degree, and sentence of imprisonment when the verdict is guilty of murder in the lesser degree.... Second. The difficulty of laying down exact and satisfactory definitions of degrees in the crime of murder, applicable to all possible circumstances, has led other legislatures to prefer the more simple and flexible rule of conferring upon the jury, in every case of murder, the right of deciding whether it shall be punished by death or by imprisonment.[25]
Some exceptions to the jury tradition emerged, albeit in an unsavory context that actually underscores the importance of the right to a jury. A few states, unhappy with the rights accorded to black citizens by the Fourteenth and Fifteenth Amendments, cut back on unanimity requirements for juries, in order to mute the voice of newly eligible black jurors.[26] But even with these exceptions, the overall picture was remarkably consistent: Defendants received death sentences only when the jury determined they should. And that jury determination had to be unanimous.[27]
One byproduct of the jury’s more explicit role in exercising sentencing discretion over whether a defendant should live or die was the emergence of a greater judicial *441 role in sentencing defendants convicted by juries of committing a crime for which death was not a possible sentence. Early in our history, those few crimes that did not carry the death penalty had relatively short, if any, prison sentences attached to them.[28] As mentioned, the term “prison” was itself not the right word, as we did not have an institutionalized system for incarcerating defendants.[29] In England and then in the early stages of our Republic, there was a tradition of sentencing by judges in,non-capital, misdemeanor cases.[30] As society determined through law that not all serious crimes should subject defendants to death and that there needed to be other serious sentencing options to fulfill objectives such as retribution and even loftier goals such as rehabilitation, institutions such as so-called “penitentiaries” where defendants could do penance for their misdeeds emerged.[31] Consistent with the tradition that judges had often decided on' the appropriate punishment when life or death was not the binary choice, judicial sentencing for non-capital offenses became more prevalent.[32] And, when the question was not the stark one of life or death, but the more nuanced one of what number of years a defendant should spend in prison, judicial expertise was perhaps seen ,as valuable.
Before fast-forwarding to the status of these trends in practice as of when Fur-man was decided in 1972, another important factor must be considered. This evolution of practices emerged without intrusion by the federal Judiciary or the federal Constitution. One cannot find U.S. Supreme Court cases addressing the constitutionality of the various state approaches to these issues. That is because it was not until 1932 that the U.S. Supreme Court first began to apply the provisions in the Bill of Rights protecting criminal defendants to the states.[33] And the wave of cases holding that the Fourteenth Amendment incorporated the procedural protections of criminal defendants and that the states had to abide by those protections to the same extent as the federal government rose in the era after World War II and crested in the 1960s.[34]
*442 Coincident with this wave was a general trend toward making the death penalty rarer in application. Some states went so far as to abolish the death penalty.[35] Delaware even did that for a brief period, from 1958 to 1961.[36] Although Delaware then reenacted the death penalty, it did so only for first degree murder. And the Delaware statute made a death sentence for first degree murder mandatory but with a safety valve involving the jury. The jury could not only use the traditional means of convicting of a lesser degree of murder as a way of avoiding the imposition of a death sentence, but could convict of first degree murder and recommend mercy and a non-capital sentence to the judge[37] — a choice juries did not have in the early years of Delaware’s death penalty.[38] This mercy safety valve was first instituted in Delaware for murder cases in 1917.[39] In giving juries discretion to exercise mercy, Delaware was consistent with the overall trends in states that retained the death penalty in the twentieth century.[40] But, by allowing the sentencing judge to disregard that mercy recommendation and instead impose death, Delaware was nearly alone.[41] *443 “By the end of World War I, all but eight States, Hawaii, and the District of Columbia either had adopted discretionary death penalty schemes or abolished the death penalty altogether. By 1963, all of these remaining jurisdictions had replaced their automatic death penalty statutes with discretionary jury sentencing.”[42]
Given the continued centrality of the jury in capital sentencing in the United States, it was perhaps mundane for the Supreme Court to say in Witherspoon v, Illinois[43] in 1968 that capital juries “express the conscience of the community on the ultimate question of life or death.”[44] After all, as of the time Witherspoon was decided, jury sentencing in capital cases was not only the norm, but was used in all but two states.[45] By contrast, judicial sentencing for non-capital cases had become prevalent, with prison sentences the primary form of punishment for most serious crimes. Importantly, it was only in this same time period that the Supreme Court held in Duncan v. Lousiana[46] that the Fourteenth Amendment incorporates the Sixth Amendment’s right to a jury trial.[47]
As of that time, the U.S. Supreme Court had still not held that the Constitution placed any particular limits on states’ imposition of the death penalty. Before then, “the death penalty was widely authorized” and states were not required by any judicial mandate implementing the federal Constitution to narrow the class of defendants eligible for death or to otherwise ensure that the death penalty was not applied in an arbitrary or discriminatory manner.[48] Consistent with the traditional lack of a federal role in these areas, the Supreme Court issued a decision in 1971 in McGautha v. California,[49] holding that a state did not need to provide capital sentencing juries with any kind of guidance or list of considerations to use in making the life-or-death determination. The Court explained why:
In light of history, experience, and the present limitations of human knowledge, we find it quite impossible to say that committing to the untrammeled discretion of the jury, the power to pronounce life or death in capital cases is offensive to anything in the Constitution. The *444 States are entitled to assume that jurors confronted with the truly awesome responsibility of decreeing death for a fellow human will act with due regard for the consequences of their decision and will consider a variety of factors, many of which will have been suggested by the evidence or by the arguments of defense counsel.[50]
By the beginning of the 1970s, the death penalty was being more sparingly applied than at any previous time in our nation’s history, and public support for the death penalty was relatively low.[51] McGautha seemed to signal the Supreme Court’s view that juries could, as a general matter, be trusted to exercise the awesome power historically entrusted to them of making the life or death decisions put to them without prescriptive federal judicial guideposts. Likewise, McGautha seemed to signal that the Supreme Court would allow death penalty law to continue to evolve based on determinations by state legislatures, But that, of course, did not turn out to be the case.
III.
The very next year, in 1972, Furman v. Georgia upset the traditions and destabilized the foundations on which state death penalty statutes stood, causing some states to respond with approaches that reduced the jury’s role in the death penalty sentencing process.[52] In Furman, the Supreme Court reviewed two Georgia Supreme Court decisions, which affirmed death sentences for a defendant convicted of murder and a defendant convicted of rape, and one Texas Supreme Court decision, which affirmed a death sentence for a defendant convicted of rape.[53] In each of the death statutes at issue, “the determination of whether the penalty should be death or a lighter punishment was left by the State to the discretion of the judge or of the jury.”[54] Because there was a jury trial in each of the three cases, under the Georgia and Texas statutes a jury ultimately sentenced each of the defendants to death.[55]
The defendants in Furman argued that the Georgia and Texas statutes contained “unbridled discretion [that] made it impossible to rationally distinguish between those who would live and those who would die.”[56] “Certiorari was granted limited to the following question: ‘Does the imposition and carrying out of the death penalty in (these cases) constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments?’ ”[57] The splintered Court held that it did.
Although the Court struck down death sentences in the cases on appeal, it stopped short of holding the death penalty unconstitutional as a categorical matter. In *445 a one-paragraph per curiam opinion, the Furman majority held “that the imposition and carrying out of the death penalty in these cases■ constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments.”[58] But, like the situation we find ourselves in today, the Court’s majority could not agree on exactly why that was so.[59] Three Justices, each authoring a separate concurring opinion, voted to strike down the death sentences because the death penalty statutes in question did not provide sufficient protections to ensure that the death penalty was not imposed in an arbitrary and capricious manner, and as a result, were applied in a racially discriminatory manner.[60] As one respected treatise explains it, the Furman plurality “held that the death penalty was so arbitrarily and randomly imposed that it violated the Eighth Amendment.”[61] The views of the two other Justices who voted to overturn the convictions is easier to state: They viewed any imposition of the death penalty to any defendant to be cruel and unusual punishment, and therefore as unconstitutional under the Eighth and Fourteenth Amendments.[62]
Despite the lack of consensus, Furman clarified that a capital sentencing scheme must meet a basic hurdle to avoid violating the Eighth Amendment: “Furman mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.”[63] In other words, what Furman established is that the sen-tencer in a capital case cannot have “unbridled discretion” in sentencing a defendant.[64]
IV.
Given that the common practice in the states before Furman was to give to the jury the discretion to impose a life or death sentence, Furman had the practical effect of “striking] down virtually every death penalty law nationwide,”[65] and creating a de facto moratorium on executions.[66] In fact, “[w]hen the Supreme Court decided Furman in 1972, almost everyone — including the Jústiees themselves— believed that America had seen its last execution.”[67] But after Furman, the prior *446 trends in the states reversed course. Instead of reacting to Furman by abolishing death penalty statutes as most people had expected, states responded by passing new death penalty statutes that they thought would satisfy the requirements Furman established.[68] Indeed, after Furman defendants again began being given death sentences at very high rates.[69]
To avoid arbitrariness and comply with the Eighth Amendment as interpreted in Furman, states experimented. Some states changed their capital sentencing schemes after Furman to allow the trial judge to make the ultimate life-or-death decision.[70] Many other states enacted mandatory statutes, which outlined a specific category of crimes for which the death penalty was the required sentence.[71] The rationale behind these statutes was an obvious response to Furman’s concern about arbitrariness and discrimination: If every defendant who committed a capital offense was subject to death, there would be no discrimination or arbitrariness in the sentencing process. Conviction would invariably equal death.[72]
Still other states took a different approach. To rationally narrow the crimes for which death was a possibility, states began to adopt more specific statutes under which a defendant would be eligible for a death sentence only if he was found to have committed, for example, not just a homicide, but a type of homicide that the statute identified as especially egregious and deserving of harsh punishment.[73] Thus, the post-Furman capital sentencing statutes often included lists of aggravating factors intended to narrow the scope of death eligible crimes and defendants.[74]
V.
By the bicentennial, this period of legislative reaction had resulted in cases ripe for Supreme Court consideration. On July 2, 1976, the Supreme Court decided four cases that addressed the constitutional adequacy of several states’ attempts to comply with Furman. The most famous of these so-called “July 2nd cases” was, of course, Gregg v. Georgia.[75] At issue in Gregg was the constitutionality of Georgia’s capital sentencing scheme that was structurally similar to that which had been struck down in Furman,[76] but which attempted to address Furman’s requirements by “providing] some sort of criteria to guide the jury’s discretion in determining whether to impose death.”[77] The Supreme Court upheld Georgia’s new capital sentencing scheme and clarified that its holding in Furman was limited to the imposition of the death penalty in the specific Georgia and Texas cases at issue in Fur-man under the then-existing statutes.[78] In *447 keeping with what it then viewed as the popular opinion in the United States,[79] the Court held in Gregg “that the punishment of death does not invariably violate the Constitution,” and specifically the Eighth Amendment.[80] And, the Court held that capital punishment is not a cruel and unusual punishment for the crime of murder, but is “an extreme sanction, suitable to the most extreme of crimes.”[81]
Of equal importance to Gregg’s validation of state approaches involving what some have called “guided discretion” was the Supreme Court’s rejection of mandatory statutes as an answer to its concerns over capricious imposition of the death penalty. In Woodson v. North Carolina,[82] the Court reviewed the death sentences of four defendants who had been convicted of first degree murder resulting from their participation in an armed robbery. North Carolina was one of the states that amended their capital sentencing schemes after Furman to make death the mandatory sentence for eligible crimes. After “sketching the history of mandatory death penalty statutes in the United States,” the Court noted that its findings “reveal[] that the practice of sentencing to death all persons convicted of a particular offense has been rejected as unduly harsh and unworkably rigid.”[83] And, the Court observed, “a mandatory death penalty statute ... does not fulfill Furman’s basic requirement by replacing arbitrary and wanton jury discretion with objective standards to guide, regularize, and make rationally reviewable the process for imposing a sentence of death.”[84]
Woodson then observed that an additional “constitutional shortcoming of the North Carolina statute is its failure to allow the particularized consideration of relevant aspects of the character and record of each convicted defendant before the imposition upon him of a sentence of death.”[85] The Court explained:
[I]n capital cases the fundamental respect for humanity underlying the Eighth Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death. This conclusion rests squarely on the predicate that the penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.[86]
After Woodson, it was widely believed that states could not specify by statute a list of erimes for which conviction would automatically result in a death sentence. Although the Supreme Court had supposedly left open that the murder of a prison *448 guard by a prisoner might be an exception[87] — a possibility the Supreme Court later expressly rejected in 1987[88] — commentators viewed the mandatory approach as having been soundly rejected.[89]
And in Jurek v. Texas?[90] the Supreme Court reviewed the conviction of a Texas man sentenced to death for murder. The .Texas statute, at issue required the sentencing jury to consider the aggravating factors during sentencing, but did not allow consideration of mitigating factors. The Supreme Court invalidated that statute, holding that “in order to meet the requirement of the Eighth and Fourteenth Amendments, a capital-sentencing system must allow the sentencing authority to consider mitigating circumstances.”[91] “A jury,” the Court reasoned, “must be allowed to consider on the basis of all relevant evidence not only why a death sentence should be imposed, but also why it should not be imposed.”[92]
In the final July 2nd case, the Supreme Court upheld the capital sentencing schemes that were amended after Furman to switch from jury to judge sentencing in capital cases from an Eighth Amendment challenge. In Proffitt v. Florida,[93] the Court recognized “that jury sentencing in a capital case can perform an important societal function,” but nevertheless explained that the Court had “never suggested that jury sentencing 4s constitutionally required.”[94] Of course, Proffitt was decided only in 1976, less than a decade after the Court had first held that the Sixth Amendment right to a jury applied against the states.[95] And Proffitt never examined that there had not been much basis as of 1976 to ponder the question of whether a defendant had a right to have a jury make the final decision as to death, given the overwhelming historical prevalence of jury sentencing authority in that most sensitive of realms.
What followed Gregg and the other July 2nd cases was another wave of new death penalty statutes that confirmed that Fur-man and its progeny had unsettled, tradition.[96] Perhaps unsurprisingly, the complexity of the procedures necessary for states to implement the death penalty in a manner consistent with the Supreme Court’s evolving case law raised new questions regarding the respective roles of judge and jury.[97] One consequence of the Supreme Court’s jurisprudence was clear, which is that it was no longer practicable for a capital defendant to be subject to a singular proceeding after which his guilt and punishment were determined simulta *449 neously, because states could not establish a mandatory death sentence regime.[98] And, states were required to take steps to limit the arbitrariness in the application of the death penalty.[99] Thus, “all death-penalty states abandoned unitary trials in favor of bifurcated proceedings that separate the case into a ‘guilty[5] phase and a ‘penalty[5] phase.[55]
[100] By and large, this meant that states had to set up a process for the consideration of all relevant factors bearing on whether a particular defendant deserved the death penalty, including mitigating factors relevant only to sentencing and not to guilt or innocence. Likewise, it meant having a process to try to ensure proportionality in the imposition of the death penalty, by making sure that it was not imposed for crimes that were not sufficiently egregious.[101] This proportionality review necessarily required a consideration of not just the[1] case at hand, but of other similar cases, and was more fitting for judicial rather than jury performance.[102]
In reaction to the very cases that gave capital defendants constitutional protections against arbitrary and capricious imposition of the death penalty, some states adopted statutes that left them exposed to a new fate that was historically unusual in American history — the possibility of being executed without a jury unanimously saying that should happen. That is, as states adopted statutes that provided specific •processes to meet Furman's core concerns, some of them increasingly shifted the locus of authority for capital sentencing determinations away from juries and toward judges.[103] In effect then, Furman and the July 2nd cases set in motion a historically unprecedented period in which sentencing in capital cases was distinct from the conviction phase, in which judges in some states came to have a more critical role, and in which it was not even clear that juries had to have a role at all.[104]
When the U.S. Supreme Court reviewed these capital sentencing statutes that state legislatures enacted or revised in the wake of Furman and Gregg, the Court also addressed cases focused on defendants’ rights under the Sixth Amendment. More specifically, after the states enacted statutory approaches to' satisfy Furman’s- key mandates, the U.S. Supreme Court issued a number of decisions addressing various issues regarding the respective roles of judges and juries in capital sentencing.
In Spaziano v. Florida,[105] for example, the Supreme Court reviewed Florida’s capital sentencing scheme, which allowed the sentencing judge to override a jury’s recommendation of life imprisonment and impose a death sentence.[106] This is precisely what happened at Spaziano’s sentencing, *450 and Spaziano contended “that allowing a judge to override a jury’s recommendation of life violates the Eighth Amendment’s proscription against ‘cruel and unusual punishments,’ ” and “that the [judicial override] practice violates the Sixth Amendment.”[107] Despite the fact that the Supreme Court had recently held in a number of cases that procedural protections from the guilt stage of a criminal case — including those guaranteed by the Sixth Amendment — also applied at the penalty stage,[108] the Court rejected Spazi-ano’s arguments and upheld Florida’s capital sentencing scheme, holding “that there is no constitutional imperative that a jury have the responsibility of deciding whether the death penalty should be imposed.”[109] As to Spaziano’s Sixth Amendment argument, the Court’s reasoning — echoing its slight Eighth Amendment discussion in Proffitt — was so cursory that it can be quoted in full:
This Court, of course, has recognized that a capital proceeding in many respects resembles a trial on the issue of guilt or innocence. Because the “embarrassment, expense and ordeal ... faced by a defendant at the penalty phase of a ... capital murder trial ... are at least equivalent to that faced by any defendant at the guilt phase of a criminal trial,” the Court has concluded that the Double Jeopardy Clause bars the State from making repeated efforts to persuade a sentencer to impose the death penalty. The fact that a capital sentencing is like a trial in the respects significant to the Double Jeopardy Clause, however, does not mean that it is like a trial in respects significant to the Sixth Amendment’s guarantee of a jury trial. The Court’s concern in Bullington was with the risk that the State, with all its resources, would wear a defendant down, thereby leading to an erroneously imposed death penalty. There is no similar danger involved in denying a defendant a jury trial on the sentencing issue of life or death. The sentencer, whether judge or jury, has a constitutional obligation to evaluate the unique circumstances of the individual defendant and the sentencer’s decision for life is final. More important, despite its unique aspects, a capital sentencing proceeding involves the same fundamental issue involved in any other sentencing proceeding — a determination of the appropriate punishment to be imposed on an individual. The Sixth Amendment never has been thought to guarantee a right to a jury determination of that issue.[110]
*451 Turning to Spaziano’s Eighth Amendment argument, the Court explained that the fact that the only three states allowed a judge to override a jury’s recommendation of life does not mean that those states’ capital sentencing schemes are unconstitutional because “[t]he Eighth Amendment is not violated every time a State reaches a conclusion different from a majority of its sisters over how best to administer its criminal laws.”[111]
The Court reaffirmed and extended its holding in Spaziano in several later cases, many of which also involved Florida’s capital sentencing scheme. In Hildwin v. Florida,[112] for example — “a per curiam decision without briefing, argument, or plenary consideration”[113] — the Court held that “the Sixth Amendment does not require that the specific findings authorizing the imposition of the sentence of death be made by the jury.”[114] Using Spaziano as a springboard, the Court reasoned that because “the Sixth Amendment permits a judge to impose a sentence of death when the jury recommends life imprisonment, ... it follows that it does not forbid the judge to make the written findings that authorize imposition of a death sentence when the jury unanimously recommends a death sentence.”[115]
And, in Clemons v. Mississippi,[116] the U.S. Supreme Court reaffirmed its view that the Constitution did not require jury sentencing or that a jury make all factual findings that are necessary to sentence a defendant to death.[117] The Court also explained in Clemons that a state appellate court may uphold a death sentence that is based in part on an invalid statutory aggravating factor — or, as I refer to it for the sake of simplicity and functional clarity, a “death eligibility factor” — as long as that error is harmless because, for example, a different death eligibility factor existed.[118]
The Supreme Court again rejected a defendant’s argument that the Constitution requires jury sentencing in capital cases in Walton v. Arizona.[119] There, a capital defendant challenged Arizona’s capital sentencing scheme under both the Sixth and Eighth Amendments. The Court first rejected Walton’s argument that Arizona’s capital sentencing scheme, which required the trial judge to make all factual findings involved in capital sentencing and gave the jury no advisory role, was sufficiently distinct from the Florida scheme the Court had upheld in Spaziano and Hildwin scheme, which did give the jury at least an advisory role, to make the Arizona statute more vulnerable under the Sixth Amendment.[120] The Court was not troubled by any lesser role for the jury. Instead, relying on Spaziano, Hildwin, and Clemons, the Court then held “that *452 the Arizona capital sentencing scheme does not violate the Sixth Amendment.”[121] Second, the Court rejected Walton’s Eighth Amendment argument, concluding that a death penalty statute does not violate the Eighth Amendment solely because it puts the burden of proving mitigating factors by a preponderance of the evidence on the defendant.[122]
Finally, in Harris v. Alabama,[123] the Supreme Court held that a capital sentencing scheme that “vests capital sentencing authority in the trial judge, but requires the judge to consider an advisory jury verdict” was not unconstitutional.[124] The Court noted the similarities between the Florida and Alabama schemes, and observed that the key difference was that the Florida scheme which it had previously upheld in the cases discussed above, unlike its Alabama counterpart, required a trial judge to “give ‘great weight’ to the jury’s recommendation and .,. not override the advisory verdict of life unless ‘the facts suggesting a sentence of death [are] so clear and convincing that virtually no reasonable person could differ.’ ”[125] Harris argued that the failure of Alabama’s statute to provide similar guidelines for considering the jury’s advisory verdict rendered the statute unconstitutional.[126] But the Court disagreed: “The Constitution permits the trial judge, acting alone, to impose a capital sentence. It is thus not offended when a State further requires the sentencing judge to consider a jury’s recommendation and trusts the judge to give it the proper weight.”[127]
‡ ^
In sum, as the law stood at the turn of the twentieth century, the Supreme Court itself held that jury sentencing was not required in capital cases, even though jury sentencing in death penalty cases had been predominant throughout our nation’s history before Furman[128] and continued to be so.[129] But, the Supreme Court had placed some limits on death sentences, such as holding mandatory death sentences unconstitutional and requiring that the sentencer consider mitigating factors.[130] And, the Supreme Court itself had recognized that its own jurisprudence had essentially required at least two different stages within a case if a state was to impose the death penalty consistent with the Constitution. To address the requirement of Furman that capital sentencing discretion be narrowed to help avoid arbitrary results, there must first be a phase that the Supreme Court has at different times called the “definition stage”[131] and the “eligibility phase,”[132] the latter of which I adopt as the more appropriate term. I refer to it as *453 the eligibility phase because that is the phase in which the defendant is found eligible for the death penalty, typically, as a result of a finding that one or more aggravating factors exists that qualify, his crime as making death an authorized punishment. This eligibility phase responds to the requirements of Furman and its progeny, such as Godfrey v. Georgia[133] and Maynard v. Cartwright[134] that there be a meaningful “narrowing” of the class of offenders eligible for the death penalty.[135] The statutory eligibility factors are typically referred to as aggravating factors, because they are seen as special circumstances that take a very serious crime, such as an unlawful homicide, and make it particularly blameworthy and thus subject to the perpetrator to a possible death sentence. Common aggravators include lolling a victim who is a peace officer and committing murder in the course of another felony.[136] As the U.S. Supreme Court itself has done for precision at times, I use the term “death eligibility factor” to describe these circumstances because it more clearly articulates what they are, and distinguishes them from the broader use of an aggravating circumstance in the next required phase.[137] Although having their origins in Furman’s mandate that the circumstances in which the death penalty be imposed be narrowed, death eligibility factors have proliferated.[138] In Delaware, for example, there are now twenty-two circumstances that, can .make a defendant death eligible.[139]
That next phase, which has been referred to among other things as the “weighing phase,” the “selection phase,” or in my view, the “ultimate sentencing phase,” is when there is an individualized determination of the sentence for the defendant.[140] This phase was required because the Supreme Court made clear that even if a state had narrowed the circumstances for which death was the authorized punishment to address the concerns raised in Furman, it still could not make death a mandatory sentence.[141] Instead, Furman and the July 2nd cases taken together mandated that a sentencing phase occur *454 during which all relevant factors bearing on whether the defendant should live or die must be considered, and during which the defendant has a constitutional right to effective representation in presenting evidence mitigating against the imposition of death. In all circumstances, the state must afford the option for the defendant to be given the comparatively more merciful option of a lengthy prison sentence as opposed to death.[142] As discussed, these developments and their complexity gave rise to a small number of statutes that cabined the jury’s historical role in the death penalty sentencing process. A notable example was the amendment to Delaware’s capital sentencing scheme in 1991, which eliminated the unanimous jury requirement in capital sentencing as a direct response to the failure of prosecutors to convince an entire jury to vote for death in a high-profile case,[143] As scholars observed, “the presumption that judges would be more willing to than juries to impose capital punishment appeared to motivate the statutory change to judge sentencing.”[144]
With the intricacy of this two-stage process arose further questions about the respective role of judge and jury in the sentencing phase process, questions that came to the fore early in this century in an important non-capital case, which I now discuss.
VI.
In 2000, the Supreme Court decided Ap-prendi, which marked a major shift in the U.S. Supreme Court’s Sixth Amendment jurisprudence and created the momentum behind the line of cases leading directly to Hurst. The relevant facts of that non-death penalty case were simple. Apprendi, who was white, had pled guilty to multiple felonies arising from an event in which he fired several bullets into the home of a black family.[145] After holding an evidentia-ry hearing on Apprendi’s intent, the trial judge concluded that Apprendi had. been motivated by racial bias.[146] Under New Jersey law, if a defendant “acted with a purpose to intimidate an individual or group of individuals because of race, color, gender, handicap, religion, sexual orientation or ethnicity,” he could be deemed to have committed a “hate crime” and be eligible for a longer sentence.[147] Thus, the trial judge found that the “hate crime” sentencing enhancement applied, and the judge increased Apprendi’s sentence accordingly.[148] The issue the U.S. Supreme Court faced in Apprendi was whether a judge, as opposed to a jury, could find facts that increased the defendant’s maximum sentence.[149] The Court held that “[ojther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and *455 proved beyond a reasonable doubt.”[150] In extending Apprendi into the sentencing guidelines context in Blakely v. Washington,,[151] the Supreme Court explained “that the ‘statutory maximum’ for Apprendi purposes is that maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.... In other words, the relevant ‘statutory maximum’ is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings.” [152]
Shortly after Apprendi, the Supreme Court decided Ring v. Arizona,[153] which applied Apprendi for the first time to the death penalty sentencing process.[154] Ring was a case in which the Court was again faced with the constitutionality of the Arizona capital sentencing scheme that it had upheld against both Sixth and Eighth Amendment challenges in Walton.[155] Ring confirmed that Apprendi’s rule extends to the death context, reasoning that “[cjapital defendants, no less than noncapital defendants ..., are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment.” [156] In other words, the Court explained, “[i]f a State makes an increase in a defendant’s authorized punishment contingent on the finding of a fact, that fact — no matter how the State labels it— must be found by a jury beyond a reasonable doubt.”[157] And then, recognizing that Walton and Apprendi were irreconcilable, Ring “overrule[d] Walton to the extent that it allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty.”[158] The Court held that “[bjecause Arizona’s enumerated aggravating factors operate as ‘the functional equivalent of an element of a greater offense,’ the Sixth Amendment requires that they be found by a jury.”[159]
VII.
A.
Ring occasioned one of the last major changes to Delaware’s own death penalty statute, and is the logical point at which to explain what our current statute provides. As of Ring, the Delaware statute had last been amended in relevant part in 1991 and provided that the jury’s findings as to whether any death eligibility factors existed and whether the aggravating factors outweighed the mitigating factors were just advisory.[160] The sentencing judge had the final say in both the eligibility and ultimate sentencing stages.[161] Delaware’s *456 approach was logical in light of the post-Furman decisions. By providing that only certain homicides that involved statutorily defined circumstances would make a defendant eligible for the death penalty,[162] the statute addressed the need to narrow the class of defendants who could be executed. By providing for a sentencing phase during which those factors that aggravated toward the death penalty and those that mitigated against it would be rationally considered,[163] the Delaware statute addressed the constitutional mandate that a death sentence not be mandatory, and instead be the product of a rational, individualized process whereby any mitigating factor could be considered. And, the statute also provided for an appellate process of proportionality review as a further safeguard against the arbitrary imposition of the death penalty.[164]
In Ring itself, the U.S. Supreme Court took note that Delaware’s then-existing capital sentencing scheme was different from the Arizona statute it was addressing. The Ring Court explained that Delaware was one of four “hybrid systems, in which the jury renders an advisory verdict but the judge makes the ultimate sentencing determinations.”[165] But Ring seemed to make Delaware’s statute vulnerable because the jury’s determination as to eligibility was not necessary, just advisory. Thus, the General Assembly amended Delaware’s death penalty statute, § 4209, to reflect its current form. The amendment changed the jury’s role in the eligibility phase “from one that was advisory under the 1991 version of § 4209 into one that is now determinative as to the existence of any statutory aggravating circumstances [i.e., death eligibility factors].”[166]
One year after Ring and the accompanying amendment to § 4209, this Court decided Garden v. State,[167] which impelled an amendment that went in the other direction and reduced the jury’s role in the death penalty sentencing process even further. In Garden, this Court reviewed the Superior Court’s imposition of a death sentence despite the jury’s recommendation of life sentences by ten-to-two and nine-to-three votes on intentional murder and felony murder charges, respectively. In response to that judicial override, Garden reversed the sentence of death and held “that a trial judge must give a jury recommendation of life ‘great weight’ and may override such a recommendation only if the facts suggesting a sentence of death are so clear and convincing that virtually no reasonable person could differ.”[168] As was the case with the legislation in 1991 eliminating the unanimity requirement for § 4209,[169] the failure of the State to obtain a death sentence because juror opposition prevented that result led to legislation to diminish the influence of the cross-section of the community empanelled to decide whether the defendant was guilty. To wit, to overrule Garden’s “great weight” standard, § 4209 was amended “to provide that the jury’s recommendation shall only be *457 ‘given such consideration as deemed appropriate.’ ”[170]
Under the current version of § 4209, the Superior Court holds a separate hearing to determine whether a defendant found guilty of first degree murder should be sentenced to death' or life imprisonment without parole. Unless the defendant has waived her right to a jury trial, the jury that found the defendant guilty is charged with ' answering two questions: (1) “[wjhether the evidence shows beyond a reasonable doubt the existence of at least 1 aggravating circumstance [i.e., death eligibility factor] as enumerated in subsection (e)”; and (2) “[w]hether, by a preponderance of the evidence ..., the aggravating circumstances found to exist outweigh the mitigating circumstances found to exist.” [171]
The jury’s answers to the two questions in § 4209(c)(3) are used in the two phases of sentencing described above, the eligibility phase and the ultimate sentencing phase. The eligibility phase involves only the jury, not the judge. Specifically, the jury determines whether at least one death eligibility factor exists beyond a reasonable doubt. “[T]he jury must be unanimous as to the existence of that statutory aggravating circumstance [i.e., death eligibility factor].”[172] If the jury finds that no death eligibility factor exists, the judge must sentence the defendant to life imprisonment.[173] But, if the jury finds that at least one death eligibility factor exists, then the defendant is death eligible and the process moves on to the ultimate sentencing phase.[174]
Unlike the eligibility phase, under § 4209 the ultimate sentencing phase involves, both the jury and the judge. The ultimate sentencing “phase does not increase the maximum punishment, but only ensures that the punishment is appropriate and proportional.”[175] First, the jury decides “[w]hether, by a preponderance of the evidence, after weighing all relevant evidence in aggravation or mitigation ..., the aggravating circumstances found to exist outweigh the mitigating circumstances found to exist.”[176] Then,
the Court, after considering the findings and recommendation of the jury and without hearing or reviewing any additional evidence, shall impose a sentence of death if the Court finds by a preponderance of the evidence ... that the aggravating circumstances found by the Court to exist outweigh the mitigating circumstances found by the Court to exist.[177]
As discussed, the jury’s finding as to whether the aggravating circumstances outweigh the mitigating circumstances “shall not be binding upon the Court,” but “shall be given such consideration as deemed appropriate by the Court.”[178] The trial judge thus has the final say in deciding whether a capital defendant is sentenced to death and need not give any particular weight to the jury’s view.
*458 B.
After § 4209 was amended in the wake of Ring, this Court answered four certified questions from the Superior Court in Brice v. State.[179] Brice found that the jury’s finding of a death eligibility factor in the eligibility phase — not the judge’s determination in the ultimate sentencing phase — is what makes a defendant eligible for a death sentence under § 4209:
Once the jury determines that a statutory aggravating factor exists, the defendant becomes death eligible. Although a judge cannot sentence a defendant to death without finding that the aggravating factors outweigh the mitigating factors, it is not that determination that increases the maximum punishment. Rather, the maximum punishment is increased by the finding of the statutory aggravator [i.e., death eligibility factor]. At that point a judge can sentence a defendant to death, but only if the judge finds that the aggravating factors outweigh the mitigating factors. Therefore, the weighing of aggravating circumstances against mitigating circumstances does not increase the punishment. Rather, it ensures that the punishment imposed is appropriate and proportional.[180]
Brice also considered the ultimate sentencing phase of the Delaware statute, which requires the sentencing judge to make her own determination of whether the aggravating circumstances outweigh the mitigating circumstances, a decision that is informed by a jury vote but not dictated by it unless the jury majority recommends a life sentence. In other words, this Court examined the reality that the sentencing judge could rely on aggravating factors in addition to whatever death eligibility factors were found by the jury. These factors — which I have defined as aggravating factors for clarity — need not have been found by the jury. But, the Court did not view that feature of Delaware’s capital sentencing scheme as problematic: “Ring does not ... require that the jury find every fact relied upon by the sentencing judge in the imposition of the sentence.”[181] Thus, as long as the jury has already found one death eligibility factor as required by Ring, the reality that a sentencing judge under our statute may consider aggravating factors that the jury does not find beyond a reasonable doubt “does not ‘increase’ the maximum penalty that a defendant can receive.”[182] In other words, Brice embraced the reading of Ring summarized by Justice Scalia in his concurrence in that case, in which he stated:
What today’s decision says is that the jury must find the existence of the fact that an aggravating factor [i.e., a death eligibility] existed. Those States that leave the ultimate life-or-death decision to the judge may continue to do so — by requiring a prior jury finding of [an] aggravating factor [i.e., a death eligibility factor] in the sentencing phase or, more simply, by placing the aggravating-factor determination [i.e., death eligibility determination] (where it logically belongs anyway) in the guilt phase.[183]
VIII.
This lengthy tour has now arrived at Hurst, the new decision of the U.S. Su *459 preme Court that our Superior Court considered such a materially new addition to our nation’s constitutional jurisprudence to certify us questions covering essentially the same issues as we confronted in Brice. The reason our learned colleague did so is obvious from a close reading of Hurst, because Hurst can either be seen, as I candidly admit, either as a plain application of Ring to a state, Florida, that did not respond to Ring’s mandate, or as signaling the recognition that a jury’s role in the death penalty process cannot be rigidly confined to the eligibility phase.
As is now widely known, Hurst held that Florida’s capital sentencing scheme was unconstitutional.[184] The Florida schéme evaluated in Hurst differed from Delaware’s in three material ways. First, Florida’s statute charged the jury with deciding by a majority vote both (1) whether a death eligibility. factor exists; and (2) whether the aggravating circumstances outweigh the mitigating circumstances. Second, Florida’s statute did not require the jury to decide whether a death eligibility factor exists beyond a reasonable doubt. And third, a jury under Florida’s statute made “an ‘advisory sentence’ of life or death without specifying the factual basis of its recommendation.”[185] In Delaware, by contrast, a jury must find a death eligibility factor unanimously and beyond a reasonable doubt. The jury in Delaware is then charged with making a non-unanimous decision of whether the aggravating factors outweigh the mitigating factors, under a preponderance of the evidence standard. That recommendation, like in Florida, is advisory,[186] but unlike Florida, does not ask jurors to specifically vote whether they believe death is the appropriate punishment. Despite these differences, there are important similarities between the capital sentencing scheme struck down in Hurst and § 4209: “Both Florida’s invalidated law and Delaware’s leave the ultimate sentencing phase and the final sentencing decision in the hands of a judge. Both have a jury make a recommendation to the court, but this is merely advisory.”[187]
In finding'that the Florida capital sentencing scheme was unconstitutional, the Supreme Court focused on the fact that it required the judge to find facts because the jury’s “recommendation” was just that — a recommendation that was advisory and to which the judge was not bound. The Court explained that “the Florida sentencing statute does not' make a defendant eligible for death until ‘findings by the court that such person shall be punished by death.’ ”[188] That statute was unconstitutional, the Court explained, because “[t]he Sixth Amendment requires a jury, not a judge, to find each fact necessary to impose a sentence of death.”[189]
In explaining its understanding of Ring, the Hurst Court observed that “Ring’s death sentence ... violated his right to have a jury find the. facts behind his punishment” because “[h]ad Ring’s judge not *460 engaged in factfinding, Ring would have received a life sentence.”[190] The Court then explained:
As with Timothy Ring, the maximum punishment Timothy Hurst could have received, without 'any judge-made findings was life in prison without parole. As with Ring, a judge increased Hurst’s authorized punishment based on her own factfinding. In light of Ring, we hold that Hurst’s sentence violates the Sixth- Amendment.[191]
In holding that Florida’s capital sentencing scheme was unconstitutional, Hurst expressly overruled its prior decisions addressing Florida’s death penalty statute in Spaziano and Hildwin “in relevant part”[192] — both cases in which the Court had rejected a defendant’s argument that jury sentencing is constitutionally required in capital cases: “Spaziano and Hildwin summarized earlier precedent to conclude that the Sixth Amendment does not require that the specific findings authorizing the imposition of the sentence of death be made by the jury. Their conclusion was wrong, and irreconcilable with Appren-di,”[193] This was a move that some Justices had been advocating for some time.[194] But, by overruling those cases only “in relevant part,” the Court left open the notion that they were problematic only insofar as Florida had not required a jury to make every fact finding required to render the defendant eligible for death. The use of the term “authorizing” could be read as supporting that view, although the term could also be seen as ambiguous and functionally indistinct from the term “necessary.”
That is, the meaning of Hurst is contestable because it uses language at critical points in a way ■ that is not necessarily consistent. For example, there is a portion of Hurst that seems to be a vanilla application of Ring. The Court explained that “[t]he analysis the Ring Court applied to Arizona’s sentencing scheme applies equally to Florida’s.”[195] But, there are other portions of Hurst which use broader, or at least less narrowly cabined language, and I understand these portions to be' those which largely motivate the questions posed to us and the contesting .positions of the parties. For example, the Court couched its holding in broader language, explaining that a jury must “find each fact necessary to impose a sentence of death.”[196]
The Supreme Court’s use of the term “necessary” in Hurst also has relevance because the author of Hurst, Justice Soto-mayor, had earlier issued a dissenting opinion from a denial of certiorari, in which she wrote that the “required finding that the aggravating factors of a defendant’s crime outweigh the mitigating factors is ... necessary to impose the death penalty.”[197] In other words, if by “necessary” in Hurst, the Supreme Court in fact meant what it said in an unqualified way, these factors would include the findings that its own jurisprudence mandate must be made at the ultimate sentencing phase before a defendant can be given a death sentence. If these necessary findings must *461 be made by a jury, then the approach taken by Delaware would be problematic.
Notably, Hurst was not a unanimous decision. It generated a concurrence from Justice Breyer, who is a passionate defender of judicial sentencing discretion in the context of non-capital cases, and dissented in both Apprendi and Ring.[198] At the same time, Justice Breyer takes the position, which he anchors in the Eighth Amendment, that no death penalty sentence can be imposed without “a jury, not a judge, mak[ing] the decision to sentence a defendant to death.”[199] “[T]he danger of unwarranted imposition of the [death] penalty,” Justice Breyer believes, “cannot be avoided unless ‘the decision to impose the death penalty is made by a jury rather than by a single governmental official.’ ”[200] “Even in jurisdictions where judges are selected directly by the people, the jury remains uniquely capable of determining whether, given the community’s views, capital punishment is appropriate in the particular case at hand.”[201] One can summarize Justice Breyer’s position this way. He believes that it is so vital to the fairness, regularity, and non-cruelty of any administration of the death penalty that it must be preceded by a unanimous determination by a jury that the defendant should die. He believes that without a cross-section of the community unanimously agreeing a defendant should die, the resulting penalty is cruel and unusual, because it so drastically departs from the American tradition. As I note later, this sounds like an oblique way of saying that there is a fundamental right to have a juiy say you should die before the state can execute you.
Finally, Justice Alito dissented in Hurst. Most importantly for present purposes, Justice Alito called for reconsideration of Ring because he believes that there is no Sixth Amendment right to have a jury decide any fact other than those necessary to guilt.[202] Justice Alito then explained that “even if Ring is assumed to be correct,” he would not extend it to Florida’s capital sentencing scheme because of the differences between Florida’s and Arizona’s at the time of Ring.[203]
After the Supreme Court decided Hurst — and after we accepted the certified question before us — the Court vacated three Alabama death penalty convictions “in light of Hurst.” [204] Although these orders provide no extensive guidance on why or how Hurst affected the Alabama convictions, the obvious connection between these cases and Hurst is that they collectively involve two of the three capital sentencing schemes that permitted a judge to override a jury’s recommendation of a life sentence before Hurst — those of Florida and Alabama.[205] The third such scheme is our own.
*462 IX.
A.
The five certified questions are:
(1) Under the Sixth Amendment to the United States Constitution, may a sentencing judge in a capital jury proceeding, independent of the jury, find the existence of “any aggravating circumstance,” statutory or non-statutory, that has been alleged by the State for weighing in the selection phase of a capital sentencing proceeding?
(2) If the finding of the existence of “any aggravating circumstance,” statutory or non-statutory, that has been alleged by the State for weighing in the selection phase of a capital sentencing proceeding must be made by a jury, must the jury make the finding unanimously and beyond a reasonable doubt to comport with federal constitutional standards?
(3) Does the Sixth Amendment to the United States Constitution require a jury, not a sentencing judge, to find that the aggravating circumstances found to exist outweigh the mitigating circumstances found to exist because, under 11 Del. C. § 4209, this is the critical finding upon which the sentencing judge “shall impose a sentence of death”?
(4) If the finding that the aggravating circumstances found to exist outweigh the mitigating circumstances found to exist must be made by a jury, must the jury make that finding unanimously and beyond a reasonable doubt to comport with federal constitutional standards?
(5) If any procedure in 11 Del. C. § 4209’s capital sentencing scheme does not comport with federal constitutional standards, can the provision for such be severed from the remainder of 11 Del. C. § 4209, and the Court proceed with instructions to the jury that comport with federal constitutional standards?
Fundamentally, the first four questions may be summarized this way: Must any death sentence be preceded by a unanimous jury verdict concluding that after considering all the relevant aggravating and mitigating factors, the defendant should suffer execution as his punishment, rather than the comparatively more merciful option of a lengthy prison sentence? And, if so, must the jury make that decision beyond a reasonable doubt?
The advocates before us take dividing positions on these questions and do so with clarity and skill, and with a close attention to the precedent. From the State’s perspective, the answer to the question above is no. The State’s well-written and well-argued position is that Hurst must be read contextually and narrowly, and that its use of the term “necessary” cannot be divorced from other language in the opinion relying on Ring and Apprendi. By “necessary,” says the State, Hurst refers only to those fact findings necessary to make the defendant statutorily eligible to receive a death sentence. That is, in the parlance I use, the State argues that the jury need only determine unanimously and beyond a reasonable doubt that a death eligibility factor exists. Beyond that point, any role for the jury is entirely optional, and a state can in fact dispense altogether with a role for the jury, and allow a judge to use his own reasoned discretion to weigh the aggravating and mitigating factors and decide whether to impose the death penalty. Put *463 simply, the State argues that Hurst should be seen as a clean-up case, where a state, Florida — that did not view Ring as applying to its statute because the Supreme Court had not overruled its decisions in Spaziano and Hildwin, in which it had upheld Florida’s capital sentencing scheme — was informed that it had to abide by Ring. The bright line for the Sixth Amendment, in the State’s conception, is that a jury must find any fact necessary to authorize a form of punishment, for the narrow purpose of making a defendant eligible for that punishment. By making the defendant eligible to receive that punishment, though, a jury need not play any role in the ultimate sentencing phase, even in a capital case. In other words, the State embraces the reading of Ring given in Justice Scalia’s concurrence in that case, and argues that his joinder in the Hurst majority opinion is further evidence of its limited meaning.
By contrast, counsel for Rauf (and several of the amicus curiae) view Hurst as going beyond Ring, and as standing for the proposition that if any finding of fact is necessary as a pre-condition to a death sentence, the Sixth Amendment requires that finding of fact to be made by a unanimous jury. Rauf argues from the plain language of the Delaware statute that findings of fact that go beyond the existence of guilt and of a death eligibility factor are “necessary” for a death sentence to be imposed in Delaware. Absent factual findings that the aggravating factors outweigh the mitigating factors, a defendant must be given a life sentence under the Delaware statute. Thus, these sentencing stage findings are literally “necessary to impose a death sentence.” [206] Raufs argument builds on other U.S. Supreme Court case law, which prevents states from having a statute whereby a death sentence is the automatic consequence of a guilty verdict, and which requires states to have a sentencing phase in which all mitigating factors must be rationally considered and after which the option of giving a non-capital sentence must exist.
Rauf is joined by amicus curiae, who echo his arguments, but who also make a more fundamental argument, which is that there is no more fundamentally important role for a jury fairly drawn from the community than determining whether a defendant should live or die.[207] They read Hurst as recognizing a more essential consideration that has been obscured in the complexity of the post-Furman world, which is that the Sixth Amendment right to a jury has perhaps its most powerful importance when the question is whether the defendant should live or die.
B.
Against this backdrop of § 4209 and the U.S. Supreme Court’s capital sentencing decisions, I explain my answer to the five certified questions. But, rather than addressing the first four questions in piecemeal fashion, I consider the broader implications of the federal Constitution and the Supreme Court’s precedent addressing it on the role of the judge and the jury under § 4209. The Sixth Amendment provides:
In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be *464 confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense.[208]
I focus here on the question of who — jury or judge — may make the determination whether a defendant should receive a death sentence or not because I believe it is inarguable that the required determination in all contexts where the sentencing authority can give a defendant death or life involves factual determinations. That is clearly so under our own statute, which plainly requires that a specific finding be made before a death sentence can be issued.[209] That finding is whether “the aggravating circumstances found to exist outweigh the mitigating circumstances found to exist.”[210] Our prior decisions have often noted that sentencing decisions, including those in the death penalty context, involve an exercise of discretion based on a weighing of facts.[211] In doing so, we broke no ground, but simply recognized an obvious reality reflected broadly in American jurisprudence that the weighing of aggravating and mitigating factors is “a clear factfind-ing directive to which there is no exception.” [212] Thus, the question in this context is not whether factual determinations are involved in the weighing phase of capital sentencing, but whether the Sixth Amendment requires those factual judgments to be made by a jury.
In one sense, the answer to the certified questions could be simple. If when Hurst said “necessary,” it meant that, then Delaware’s death penalty statute is unconstitutional. Under our statute the findings required to make a defendant “eligible” for the death penalty are not sufficient to enable him to be sentenced to death. Rather, it is obvious that § 4209 makes other findings necessary. That necessity is in fact dictated by U.S. Supreme Court precedent.
In concluding that Hurst requires the invalidation of our state’s approach to the death penalty, I do not wish to elide the potency of the other side of the question. Hurst can be read as having used the loose language of necessity to describe only what is necessary to make a defendant death eligible, especially because the statute at issue in Hurst failed on that narrower basis, which Delaware’s does not. But, I am reluctant to conclude that the Supreme Court was unaware of the implications of requiring “a jury, not a judge, to find each fact necessary to impose a sentence of death.”[213] If those words mean what they say, they extend the role of a death penalty jury beyond the question of eligibility. *465 Even more, these words seem to be the latest spade work in the judicial unearthing of an unattractive byproduct of a lengthy period of judicial innovation.
That byproduct is that the Furman line of U.S. Supreme Court precedent has been a causal factor in impelling a small number of states (of which Delaware is one) to adopt a death penalty system that would have been fundamentally alien to the founding generation, a system under which a defendant can be executed even if a unanimous jury does not believe that is the correct penalty.[214] What has emerged is a system whereby there is a strange admixture of the role of judge and jury in this most sensitive of areas — an admixture that allows a defendant to go to, his death without a jury of his peers unanimously concluding that he should do so. Although perhaps not compelled to do so by the formal logic of Hurst,[215] I am persuaded that it is not tenable under the broader logic of the case, and a consideration of related provisions of the Constitution, including the Eighth Amendment, to pretend any longer that this admixture is consistent with the fundamental guarantee of a jury trial as it was understood throughout most of our history — one in which “[t]he Founders viewed juries as so fundamental to the democratic experience that the right to a jury in criminal trials is the only right expressly included twice in the Constitution”[216] — and as most states still under *466 stand it today.[217]
In so finding, I acknowledge the argument, made powerfully by Justice Scalia and others, that Furman unsettled the traditional practice and that the deviation from the traditional practice that a jury simultaneously decided guilt and punishment resulted from the decisions of three justices in Furman that said that ,the death penalty could be imposed only if the sentence is imposed in some non-arbitrary way.[218] In Furman and the decisions that followed it, the Supreme Court said that states could not find that certain crimes, such as intentional murder, were so heinous that a verdict of guilt automatically resulted in a death sentence.[219] Instead, each defendant, regardless of whether he committed an intentional murder, had a right to have the sentencing authority consider all mitigating factors and weigh them against the aggravating factors.[220] And, of course, the full bite of Strickland v. Washington[221] enforced the duty of counsel to present those factors with effectiveness. Not only that, to avoid arbitrariness, statutes were revised to include procedures such as the proportionality review as a way to ensure that capital punishment was meted out non-capriciously.[222] It was these and other mandates that states like Delaware reacted to in shaping their current death penalty statutes. Even my long earlier account of the evolution of past death penalty jurisprudence slights the complexity of the law in this area. For present purposes, what must be acknowledged is that much effort has been expended by many states since Furman, including by our own,[223] to design procedures that complied with the intricate Supreme Court case law designed to ensure that capital sentences would only issue in conformity with the Constitution.
Obscured in the complexity of the Fur-man line of cases, however, was something fundamental: The overwhelming trend before 1972 was that a defendant was not sentenced to death without the support of a unanimous jury of the defendant’s peers determining that was appropriate.[224] Scholar’s[225] and judges [226] have set forth this *467 history in compelling terms. In fact, the U.S. Supreme Court itself expressed the importance of jury sentencing in capital cases in Winston v. United States [227] in 1899:
The authority of the jury to decide that the accused shall not be punished capitally is not limited to cases in which the court or the jury is of opinion that there are palliating or mitigating circumstances. But it extends to every case in which, upon a view of the whole evidence, the jury is of opinion that it would not be just or wise to impose capital punishment. How far considerations of age, sex, ignorance, illness, or intoxication, of human passion or weakness, of sympathy or clemency, or the irrevocableness of an executed sentence of death, or an apprehension that explanatory facts may exist which have not been brought to light, or any other consideration whatever, should be allowed weight in deciding the question whether the accused should or should not be capitally punished, is committed by the act of congress to the sound discretion of the jury, and of the jury alone.[228]
And, as noted above,[229] the Supreme Court in 1968 described the jury’s role in capital cases as “express[ing] the conscience of the community on the ultimate question of life or death.”[230]
That juries historically acted as the sentencing authorities in capital cases is not an anomaly. Rather, it makes sense. After all, it was the jury’s role as the conscience of the community on issues of proportionality and mercy that was recognized as making its role in capital sentencing so vital.[231] As Declaration of Independence signee and future federal judge Francis Hopkinson wrote in 1786:
[The authority to sentence] can no where be lodged so safely as with the jury who find the fact. The proportion of punishment, equitably due according to the nature of the offence, is not a question involved in the technical subtleties of the law; but arises from the particular circumstances of the case, ... and an honest, impartial, and conscientious jury, are as competent to this purpose, as the most profound judge. They will necessarily have heard the state of the whole matter, with the arguments for the prosecution, and in behalf of the prisoner; and being a temporary body, accidentally brought together, and impaneled for the occasion, are more likely to do substantial justice, than a judge who is so hackneyed in criminal prosecutions. .. ,[232]
Given the significance that jury sentencing has historically had, then, it should come as no surprise that “jury sentencing is ... the norm for capital cases.”[233]
*468 Further, one need look no further than the aggravating and mitigating factors that the U.S. Supreme Court approved for use in making capital' sentencing determinations to see the factual nature of questions involved and how they came to bear on the issue of what punishment the defendant should suffer. As to aggravating factors, for example, the sentencing authority may consider “whether the crime was committed in the course of one of several enumerated felonies, whether it was committed for pecuniary gain, whether it was committed to assist in an escape from custody or to prevent a lawful arrest, and whether the crime was especially heinous, atrocious, or cruel.”[234] As to mitigating factors, approved considerations include “whether the defendant has a prior criminal record, whether the defendant acted under duress or under the influence of extreme mental or emotional disturbance, whether the defendant’s role in the crime was that of a minor accomplice, and whether the defendant’s youth argues in favor of a more lenient sentence than might otherwise be imposed.” [235] The core of each of these questions is a factual inquiry that a cross-section of the community is best suited to make.[236] And on an even more basic level that extends beyond the capital sentencing context, appellate courts give enormous deference to a judge’s or jury’s sentencing determination precisely because of the factual nature of the issues involved in sentencing generally and the inescapable requirement for the sentencing authority to apply its discretionary sense of conscience and mercy to the case at hand.[237]
In my view, Hurst has starkly revealed a perverse result of some of the post-Furman efforts to adopt capital sentencing schemes that are constitutionally satisfactory, which is that perhaps the most fundamental protection of the Sixth Amendment has been dropped from the panoply of rights accorded to the defendant — the right to be put to death only if twelve members of his community agree that should happen.[238] There are, of course, reasons why this fundamental issue has been elided. They include the reality that for most crimes, judges make the key sentencing determination. Times have changed greatly since the founding, when prison sentences were rare, and with changing times has come a diminution (although by no means an elimination) [239] of statutorily mandated sentences. Some cognitive dissonance can be caused by holding that, unlike other sentencing options, a sentence of death may only be issued con *469 sistent with the Sixth Amendment if the jury itself believes that is appropriate.
But if ever Emerson’s famous maxim had purchase, it would be here. The Supreme "Court has long said that “death is different.” [240] Furman was based on that notion, and however Balkanized the five votes in Furman were, that case has remained part of our nation’s jurisprudence for forty-four years.[241] Many cases recognize that the Constitution’s protections apply with special force to capital cases, because of their uniquely high stakes.[242] No doubt there are Justices who have disclaimed any explicit reliance on the distinction between a case involving a potential for a death sentence and one involving only potential incarceration. Still, it is easy to say that the approach taken in, for example, Strickland cases — which suggest that what an attorney must do to be effective in a death penalty case involves greater effort than in a non-capital case [243]— arises from the recognized principle that when what is at stake is of greater importance, what is a reasonable effort must be measured against that reality. Of course, that is another way in this context of taking into account that death is different, a point the Supreme Court has made by:
• Narrowing the class of crimes for which the death penalty may be imposed by holding that death may not be imposed for rape of an adult woman,[244] kidnapping,[245] murder where the defendant had not killed, attempted to kill, or intended to kill anyone,[246] and rape of a child that does not result in the child’s death;[247]
• Narrowing the class of defendants eligible for the death penalty by holding that the death penalty may not be imposed upon defendants who are insane,[248] mentally retarded,[249] or *470 minors;[250] and
• Continually explaining that capital sentencing requires special considerations and rules that are not applicable in non-capital sentencing, including special hearsay considerations,[251] special consideration of mitigating aspects of a defendant’s character,[252] and mandatory consideration of lesser-included offenses.[253]
For present purposes, the precise reason why that inspires the differential approach is immaterial. The important thing is the undisputed reality that the Supreme Court often applies the protections of the Consti *471 tution differently to death penalty cases than to other criminal cases.[254]
Although it might be possible to resolve the case before us on the narrow basis we did in Brice by qualifying the broad use of “necessary” in Hurst to mean only necessary to death eligibility, I believe that would involve ignoring the core issue that Hurst and its predecessor cases have laid bare, which is how it can be consistent with the Sixth Amendment (or for that matter the Eighth Amendment) for a state to deny a defendant the right to have a jury make the determination whether he should live or die. It is only by reference to the intricate post-Furman jurisprudence of the U.S. Supreme Court that I can rationalize a justification for current practice.[255] That rationalization is this unsatisfactory one: Having interpreted the Constitution to make states comply with procedures after Furman that were not recognized before it, it would be unfair to make states do so while requiring them to condition any death sentence on a unanimous jury verdict to that effect.
This is not to say that close consideration of complex case law is not important. But, it is to say that when much of that case law has slighted one of the most central protections of the Sixth Amendment in the most compelling of contexts,[256] a consideration of the Constitution itself and its purposes is more important.[257] And *472 the cursory rejection of the Sixth Amendment claims in Spaziano and Hildwin by conclusory language without persuasive reasoning for support is a gruel too thin to sustain the failure to recognize the vital importance of the jury’s role in the capital sentencing process. Hurst, of course, overruled Spaziano and Hildwin only in relevant part, but I cannot discern interpretive wisdom in those cases that survives Hurst, if it was ever existent.[258] And to the extent early post-Furman cases like Proffitt were grounded in the hypothesis that judges would be better positioned to ensure the proportional, non-discriminatory application of the death penalty than unanimous juries drawn from the community,[259] empirical evidence since then seems to have contradicted that prediction.[260] As one scholar has explained:
[W]hen it comes to capital cases, there is no historical support for the line that Ring attempts to draw between factfind-ing to establish death eligibility, on the one hand, and the ultimate sentencing, or selection decision, on the other. There simply was no eighteenth-century practice that limited juries to a purely fact-finding role, while granting judges the ultimate power to choose a death sentence. To the contrary, in 1791 — and indeed for more than a century thereafter — the unified nature of capital trials left the ultimate decision of life or death in the hands of juries.[261]
To my mind, the deeper logic of Apprendi, Ring, and Hurst cannot be confined neatly to the death eligibility stage of a capital case.[262] That confinement can be *473 done only by accepting an admixture of the historical understanding of the role of the jury, based on the (understandable, but not ultimately satisfying) notion that states have to be given wiggle room after Fur-man, because Furman unsettled longstanding practices.[263]
Likewise, I do not find convincing an attempt to draw fine lines between the role of the jury as a fact-finder and the role played by the sentencing authority. Since Furman, it has been understood that whatever authority is given the power to determine the sentence in a capital case must consider the relevant aggravating and mitigating factors, balance them, have an option to give life, and base any deten-mination to give a death sentence on a determination that the aggravating factors outweigh those mitigating for the comparatively more merciful one.[264] Not only does this involve a consideration of the facts, it results in a decision of existential fact: Whether the defendant should live or die. If U.S. Supreme Court jurisprudence has and therefore can turn on a determination that death is different,[265] it is certainly appropriate to recognize that the decision to give death or life is the most important one that can be made in any criminal trial, and that the Sixth Amendment right was understood as of its adoption and for much of our history as allocating that authority to the jury.[266]
*474 As this discussion suggests, the intricacy of the judicially built regime for capital sentencing has contributed to legal arguments, and even judicial opinions, built on non-bearing foundations. Perhaps fearing that determining that the Sixth Amendment requires that any death sentence be predicated at minimum on a unanimous jury verdict would somehow require a determination that the Sixth Amendment also requires that a jury determine any criminal sentence, judicial opinions have taken the view that it is only those fact findings that make a defendant eligible to receive a death sentence that must be made by a jury.[267] In other words, they read the Sixth Amendment jury right as extending only up to those findings they view as necessary to establish the minimum and maximum sentences, even though other trial rights in the Constitution persist throughout the full sentencing process, whether the sentence is imposed by a judge or jury.[268] The logic these opinions are missing, however, is that because the U.S. Supreme Court has held that a consideration of mitigating factors, and a balancing of the aggravating and mitigating factors are prerequisites to death, the weighing stage of capital sentencing will always be “necessary” for the imposition of a death sentence.[269] That is, because the constitutionally required weighing phase comes after the finding of a death eligibility factor, a step necessary for the imposition of death will always remain after the eligibility phase occurs and no state will be able to draft a statute in which the factual findings that occur after the eligibility phase are not necessary for death.
Not only that, I cannot find in the text of the Constitution any dividing line involving facts necessary to get the “maximum” or “authorized” punishment. Rather, judges have construed this as a notice requirement inherent in the Due Process Clause, and as providing a right to have a jury make the factual determination as to any matter that establishes the maximum authorized sentence.[270] This judicial interpretation led to Justices tussling over whether it is applicable only to the maximum, or also to the minimum,[271] a debate *475 resolved only in 2013 in Alleyne v. United States [272] in favor of it applying it to both. This approach is often justified as considering factual findings necessary to set a range of sentence as an element of the crime itself,[273] even though that is formally not the case. They treat the factors malting the defendant eligible for a higher punishment as essentially “elements” of an “aggravated” version of the underlying crimes.[274] And as to this point, it is not clear what constitutional line exists involving facts that aggravate toward greater punishment or those that mitigate toward leniency. These are both key factual components, and yet only the former are even considered in Ring and Hurst.[275] Perhaps that is because mitigating factors do not go the maximum sentence. But, a consideration of the mitigating factors is every bit as crucial — as necessary — to the determination of life or death.[276] In Blakely v. Washington, as noted, the Supreme Court said “that the ‘statutory maximum’ for Ap-prendí purposes is that maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.”[277] If that is so, in the death penalty context, the fact finding necessary to sentence a defendant to death cannot avoid a consideration of mitigating factors too.
At the same time, those who would stretch Ring and Hurst — including the defendant here — embrace arguments that also have a strained quality. These arguments ensnare states in their own efforts to comply in good faith with cases like Furman. Thus, because every state retains some role for the jury in the capital sentencing process, and because Supreme Court jurisprudence such as Woodson requires that any death sentence be premised upon a consideration of whether the aggravating factors outweigh those in mitigation, gotcha arguments with a somewhat artificial quality naturally arise.[278] Seizing *476 on the reality that any ultimate and rational sentencing determination that involves the discretion to give a heavier or lighter punishment will involve the sentencing authority’s exercise of weighing the circumstances that justify a greater sentence against those counseling for a lesser one, advocates can logically argue that any death sentence must be made by a jury.[279] Why? Because the Supreme Court-mandated default is that a defendant receive a life, not death sentence, unless it is ultimately found that the aggravating circumstances outweigh those in mitigation. As the Supreme Court noted in Kansas v. Marsh,[280] “the State always has the burden of demonstrating that mitigating evidence does not outweigh aggravating evidence. Absent the State’s ability to meet that burden, the default is life imprisonment,” [281] By considering this a “fact finding” essential to the imposition of a death sentence, voila, a Sixth Amendment right is created. But, rather than this conclusion being the result of a focused consideration of the jury right in the Sixth Amendment and what it means, this conclusion emerges as the product of piecing together judicial decisions, all of which were rendered in the last fifty years. And the conclusion is therefore only as good as you think the prior decisions were, and if they, as some have felt, were not based on an accurate reading of the Constitution, the outcome is hardly convincing.[282] Thus, the retort to this line of reasoning is available to those making it only because of prior cases that, in the view of jurists and advocates of a different view, imposed upon the states a regime of death penalty jurisprudence not recognized in this nation until the 1970s.
I recognize that this type of jurisprudential serve-and-volley is to some extent endemic to our system of law, and its use of judicial review, and sometimes encourages judicial opinions that read like exercises in predicting the outcome of our political sporting contests. But, the death penalty context represents one in which our nation’s Supreme Court is increasingly called on to build out the interior of an edifice *477 entirely of its own construction. The hazards for statute writers, prosecutors, defense attorneys, defendants, trial courts, and state appellate judges of trying to anticipate what designs will prove durable áre formidable. In particular, determining the respective roles of jury and judge has been especially challenging.
In deciding as I do, I therefore am reluctant to rest my answers.on this kind of reasoning, because there is no predictable or principled way to choose between these approaches, which turn on irresolvable debates about what current or future Justices might think about the wisdom, meaning, and application of complex precedent to state legislative attempts to comply with the post -Furman mandates. Those who argue that a greater role for the jury is required do not want a full return to pre-Furman practices.[283] Those who argue that the jury’s role can stop short of capital sentencing itself contend that it would be unfair to the states to lard a jury sentencing requirement on top of judicially constructed death penalty requirements that were established only since the early 1970s.[284]
Instead of entering a guess-work world to which I am an outsider, I prefer to isolate the fundamental interests at stake. Accepting Furman, for all its fractures, as establishing that states cannot establish crimes for which death is the automatic sentence, and accepting Gregg and its progeny as establishing that any death sentence must be based on a rational consideration of the aggravating and mitigating factors and that there must be an option to give life, I also accept another reality of the case law, which is that the Supreme Court cases acknowledge what our history shows, which is that death is different.[285] Under this line of cases, fact findings beyond eligibility are not optional; they must be made and are necessary. Rather than write more and more intricate judicial decisions parsing different kinds of fact findings, I conclude that Hurst is best read as restoring something basic that had been lost. At no time before Furman was it the general practice-in the United States for someone to be put- to death without a unanimous jury verdict- calling for that final punishment. Overlooking the role juries played in capital sentencing before Furman and its progeny altered the status quo would be ignoring nearly 200 years of our nation’s customs and traditions.
The U.S. Supreme Court has often drawn lines regarding when constitutional rights come into play and when they are transgressed.[286] That has long been true in *478 criminal law itself.[287] If, as I conclude, the jury right is a fundamental one that was understood at founding to involve the right to have a jury determine whether a death sentence should be imposed,[288] then that right should be enforced. The recognition that death is different is not one first made by judges in the 1970s. It was recognized throughout our nation’s history, and was a key reason why a jury was required to unanimously agree that any death sentence would be imposed. There is no more important part of the criminal trial process than the sentencing phase in a capital case. In allowing judges rather than juries to make “a choice between life and death,” the Delaware statute “sanctions a practice that the Framers never saw and would not have tolerated.” [289] Throughout our history, capital sentencing has been a “responsibility traditionally left to juries,”[290] and the decision of whether a “fellow citizen should live or die” has been considered a responsibility too great for any one person to make alone.[291]
Two other considerations are at play here. First, as members of the U.S. Supreme Court have eloquently written, disconnecting the right to a jury from the death penalty creates a strong argument that the resulting punishment is unusual.[292] The reason for that is that the role of the jury was understood as especially critical when the punishment for a crime involved death, and that a defendant should be executed only if a jury of his peers unanimously determined that was so. It was understood that this would make giving a death sentence harder in some important circumstances, and that was why the jury right was important. By sending someone to the grave based on the determination, not of a unanimous jury, but simply of a judge, a state denies the defendant a fundamental procedural protection long part of the American tradition. The unanimous jury requirement also best assures that defendants are sent to death only when a representative sample of the community *479 agrees, because the voice of minority perspectives in the jury room is assured equal weight in this most high stakes of decisions.[293] But, in my view, the Eighth Amendment bank-shot approach of requiring jury sentencing is just an intricate way of confronting the implication of a direct Sixth Amendment approach. That implication is that it was understood that no defendant would go to the gallows unless a jury of his peers said he should. That is, that a defendant had a right to have a jury say whether he should live or die. That this fundamental, historical right is respected and restored is more important than the numerical constitutional amendment under which that happens.
Second, a requirement that a jury unanimously decide that a defendant should receive a death sentence does not mean that there can be no role for the judge. Rather, it would remain constitutional for states to provide a meaningful role for the trial judge in reviewing any death sentence recommendation made by a jury and giving the trial judge the option to give a more merciful sentence if she believed that was justified.[294] As with any other case, traditional motions addressed to the jury’s determinations could be addressed to the trial judge.
In sum, I find that no death sentence can be given unless that sentence is first determined to be appropriate by a unanimous jury, properly charged with weighing the aggravating and mitigating factors for itself.
C.
Before concluding, I must also address two specific issues posed by the first four certified questions before us.[295] The first *480 issue regards unanimity. I have used the term “unanimously” throughout this opinion, presaging my answer to part of the fourth certified question, which is that a defendant cannot be sentenced to death without a unanimous jury decision to that effect. Not only is the tradition in Delaware is that a jury act unanimously,[296] that is the American tradition and the understanding of how the jury right worked when it was embodied in the Sixth Amendment to our Constitution.[297] The unanimity requirement is vital to making sure that jurors deliberate and take each other’s vote seriously, and that all jurors have equal voice in making this most critical of decisions.[298]
Indeed, the only anomaly to the tradition of the unanimous jury verdict in Delaware is the recent one introduced into our own death penalty statute, an innovation expressly intended to bypass the safeguard that a unanimous jury requirement pi-ovides against the imposition of the ultimate punishment of death.[299] If Hurst means what it says, then the finding required to be made for the imposition of a death sentence must not only be made by a jury, it must be made by a unanimous jury.[300]
*481 The other issue is whether the jury must find any fact that constitutes an aggravating circumstance in the ultimate sentencing phase beyond a reasonable doubt, and whether any determination it makes that a defendant should suffer death because the factors aggravating for that outcome outweigh any mitigating factors, including the jury’s own sense of mercy, must be found beyond a reasonable doubt. As is well-explained in Justice Holland’s excellent concurring opinion, which I happily join, the answer to those questions is “yes.” As Justice Holland shows, § 4209 requires the state to identify any non-statutory aggravating factors that it is relying upon in the sentencing phase in aid of its pursuit of a death sentence. And as discussed, it is clear that statute requires the jury to consider whether the aggravating factors relevant to sentencing, be they a statutory death eligibility factor or any pure sentencing aggravator, outweigh the mitigating factors.
As I have discussed, the jury’s role in the administration of the death penalty was considered essential from the inception of our Republic. Part of the protective armor the right gave to a defendant against unwarranted imposition of the death penalty was not just that a jury be unanimously convinced that the death penalty was appropriate, but that the jury had to have an extremely high level of confidence that the ultimate punishment should be imposed. The beyond a reasonable doubt standard employed throughout our history in criminal proceedings reflects the importance our society places on ensuring that criminal punishment is not imposed lightly.[301] When juries found defendants not guilty at all when any kind of murder or serious felony resulted in a mandatory death sentence, or guilty of a lesser degree of murder because first degree murder carried mandatory death sentence when degrees of murder came in to temper that feature of the law, the beyond a reasonable doubt standard was, along with the unanimity requirement, a critical feature in ensuring that no one was executed unless the jury was highly confident that that was the equitable result. To wit, because for much of our history death was the mandatory result of conviction, the beyond a reasonable doubt standard acted as a safeguard in punishment too, not just conviction.[302]
There is no circumstance in which it is more critical that a jury act with the historically required confidence than when it is determining whether a defendant should live or die. If, as a majority of us have *482 concluded, the Sixth Amendment requires a jury to make all the necessary factual determinations relevant to a capital defendant’s fate, there is no reason to depart from the long-standing beyond a reasonable doubt standard when the jury is making the crucial fact-laden judgment of whether the defendant should be executed.[303] Put simply, the Sixth Amendment right to a jury includes a right not to be executed unless a jury concludes unanimously that it has no reasonable doubt that is the appropriate sentence.[304]

. 408 U.S. 238, 92 S.Ct, 2726, 33 L.Ed.2d 346 (1972).

. - U.S. -, 136 S.Ct. 616, 193 L.Ed.2d 504 (2016).

. Id. at 619.

. Id. at 624.

. 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

. See, e.g., John G. Douglass, Confronting Death: Sixth Amendment Rights at Capital Sentencing, 105 Colum. L. Rev. 1967 (2005); Nancy Gertner, A Short History of American Sentencing: Too Little Law, Too Much Law, or Just Right, 100 J. Crim. L. & Criminology 691 (2010); Morris B. Hoffman, The Case for Jury Sentencing, 52 Duke L.J. 951 (2003); Erik Lillquist, The Puzzling Return of Jury Sentencing: Misgivings About Apprendi, 82 N.C. L. Rev. 621 (2004).

. See United States v, Grayson, 438 U.S. 41, 45, 98 S.Ct. 2610, 57 L.Ed.2d 582 (1978), superseded by statute, Sentencing Reform Act of 1984, 18 U.S.C. § 3551 et seq., 28 U.S.C. §§ 991-998, as recognized in Barber v, Thomas, 560 U.S. 474, 130 S.Ct. 2499, 177 L.Ed.2d 1 (2010); Lillquist, supra note 6, at 641-43.

. See Woodson v. North Carolina, 428 U.S. 280, 289, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); Evan J. Mandery, Capital Punishment in America: A Balanced Examination xxi (2d ed. 2012).

. See Douglass, supra note 6, at 1977-78.

. See Woodson, 428 U.S. at 289, 96 S.Ct. 2978; John W. Poulos, The Supreme Court, Capital Punishment and the Substantive Criminal Law: The Rise and Fall of Mandatory Capital Punishment, 28 Ariz. L. Rev. 143, 200 (1986).

. Woodson, 428 U.S. at 290, 96 S.Ct. 2978; see also Hugo Adam Bedau, The Death Penalty in America: Current Controversies 4 (1997).

. See Bedau, supra note 11, at 4-5 ("In rapid order most states followed Pennsylvania's lead, so that today every American jurisdiction that authorizes the death penalty for murder does so by limiting it to those convicted of murder in the first degree....”); see also Raymond Taylor Bye, Capital Punishment in The United States 5-6 (1919); 6 Wayne R. LaFave, et al„ Criminal Procedure § 26.1(b), at 670-71 (3d ed. 2007).

. Walton v. Arizona, 497 U.S. 639, 710-11, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990) (Stevens, J., dissenting) (quoting Welsh S. White, Fact-Finding and the Death Penalty: The Scope of a Defendant's Right to Jury Trial, 65 Notre Dame L, Rev. 1, 10-11 (1989)) (internal quotation marks omitted); see also Ronald F. Wright, Rules for Sentencing Revolutions, 108 YaleLJ. 1355, 1373 (1999).

. See, e.g., State v. Baynard, 1 Del.Cas. 662 (O. & T. 1794); State v. Donavan, 1 Del.Cas. 168 (O. & T. 1798); see also State v. Jeandell, 5 Del. 475, 483 (Gen. Sess. 1854).

. See Lillquist, supra note 6, at 628-29; Nancy J. King, The Origins of Felony Jury Sentencing in the United States, 78 Chi.-Kent L. Rev. 937 (2003).

. Douglass, supra note 6, at 1972.

. See Woodson, 428 U.S. at 293, 96 S.Ct. 2978; see also Roberts v. Louisiana, 428 U.S. 325, 360, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976) (White, J., dissenting); Furman v. Georgia, 408 U.S. 238, 298, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (Brennan, J., concurring); Jeffrey B. Abramson, We, the Jury: The Jury System and the Ideal of Democracy 217 (1994); Valerie P. Hans & Neil Vidmar, Judging the Jury 149-58 (1986); Jenia Iontcheva, Jury Sentencing as Democratic Practice, 89 VA. L. REV. 311, 321-22 (2003); see also Rachel E. *439 Barkow, Recharging the Jury: The Criminal Jury’s Constitutional Role in an Era of Mandatory Sentencing, 152 U. Pa. L. Rev. 33, 79 (2003); Thomas A. Green, The Jury and the English Law of Homicide 1200-1600, 74 Mich. L. Rev. 413, 430-31 (1976).

. See Clay S. Conrad, Jury Nullification: The Evolution of a Doctrine 47-48 (2014); White, supra note 13, at 30-31 (“[I]t became accepted that in homicide cases the jury would exercise its nullification power when it believed that the defendants — although they might be technically guilty of the capital offense — did not deserve to die. Thus, in this context, the jury’s fact-finding power has historically been used to temper the application of capital punishment so that it will mirror the community’s perception as to when that punishment is appropriate.”).

. C.F. Adams, The Works of John Adams 255 (1865).

. See supra note 12 and accompanying text.

. See Woodson, 428 U.S. at 291, 96 S.Ct. 2978.

. See Del. C. ch. 127 §§ 1,2 (1852).

. See State v. Reidell, 14 A. 550, 550 (Del. 1888).

. See Woodson, 428 U.S. at 291, 96 S.Ct. 2978; Bedau, supra note 11, at 5-6; BYE, supra note 12, at 7-8.

. Winston v. United States, 172 U.S. 303, 310-12, 19 S.Ct 212, 43 L.Ed. 456 (1899).

. E.g., Robert J. Smith & Bidish J. Sarma, How and Why Race Continues to Influence the Administration of Criminal Justice in Louisiana, 72 La. L. Rev. 361, 375-78 (2012).
Regrettably, Delaware was among the many states that embarked on a century-long campaign of resistance to the rights granted to black people by the Fourteenth and Fifteenth Amendments, including those related[1] to juries. In justifying the total absence of any black citizens in grand and petit jury pools as “nowise remarkable,” Delaware’s then-Chief Justice said that "the great body of black men residing in this State are utterly unqualified by want of intelligence, experience or moral integrity to sit on juries.” Neal v. Delaware, 103 U.S. 370, 402, 26 L.Ed. 567 (1880) (Waite, C.J., dissenting) (quoting the Delaware Supreme Court's opinion) (internal quotation marks omitted). A divided U.S. Supreme Court held that this exclusion violated the Fourteenth Amendment, but dissenters embraced the rationale that categorical exclusion of black people from juiy pools on the basis of their presumed unfitness to serve was constitutional. See id. at 397-98 (Harlan, J.) (finding that Delaware’s practice of restricting juries to '"free white male citizens, of the age of twenty-two years and upwards” was in violation of the Fourteenth Amendment); id. at 407-08 (Waite, C.J., dissenting) (“No one can truly affirm that women, the aged, and the resident foreigner, whether Caucasian or Mongolian, though excluded from acting as jurors, are not as equally protected by the laws of the State as those who are allowed or required to serve in that capacity. To afford equality of protection to all persons by its laws does not require the State to permit all persons to participate equally in the administration of those laws, or to hold its offices, or to discharge the trusts of government,”).

.See Andres v. United States, 333 U.S. 740, 748, 68 S.Ct. 880, 92 L.Ed. 1055 (1948) ("In criminal cases this requirement of unanimity extends to all issues — character or degree of the crime, guilt and punishment — which are left to the jury.”); id. at 763, 68 S.Ct. 880 (Frankfurter, J., concurring) ("The fair significance to be drawn from State legislation and the practical construction given to it is that it places into the jury's hands the determination whether the sentence is to be death or life imprisonment, and, since that is the jury’s responsibility, it is for them to decide whether death should or should not be the consequence of their finding that the accused is guilty of murder in the first degree. Since the determination of the sentence is thus, in effect, a part of their verdict, there must be accord by the entire jury in reaching the full content of the verdict.”).

. See Joel' Samaha, Criminal Procedure 475 (2011); Corintia Barrett Lain, Furman Fundamentals, 82 Wash. L. Rev. 1, 23 (2007).

. See supra note 7 and accompanying text.

. See Wright, supra note 13, at 1374-75; King, supra note 15, at 985-86.

. See United States v. Moreland, 258 U.S. 433, 448, 42 S.Ct. 368, 66 L.Ed. 700 (1922); see also Arthur W. Campbell, Law of Sentencing § 1.2, at 6-9 (3d ed. 2004); Douglass, supra note 6, at 2018.

. See Hoffman, supra note 6, at 965; Lillquist, supra note 6, at 628-29.

. See Powell v. Alabama, 287 U.S. 45, 71, 53 S.Ct. 55, 77 L.Ed. 158 (1932).

. See, e.g., In re Oliver, 333 U.S. 257, 271-73, 68 S.Ct. 499, 92 L.Ed. 682 (1948) (incorporating the Sixth Amendment right to a public trial and to notice, of accusations); Wolf v. Colorado, 338 U.S. 25, 27-28, 33, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949) (“[T]he security of one’s privacy against arbitrary intrusion by the police — which is at the core of the Fourth Amendment — is basic to a free society [and i]t is therefore implicit in ‘the concept of ordered liberty’ and as such enforceable against the States through the Due Process Clause.”), overruled.in part by Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); Mapp, 367 U.S. at 655-56, 81 S.Ct. 1684 (further incorporating the Fourth Amendment exclusionary rule by holding that "all evidence obtained by searches and seizures in violation of the Constitution is ... inadmissible in a state .court”); Robinson v. California, 370 U.S. 660, 667, 82 .S.Ct. 1417, 8 L.Ed.2d 758 (1962). (incorporating the Eighth Amendment protection against cruel and unusual punishment); Gideon v. Wainwright, 372 U.S. 335, 342, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (incorporating the Sixth Amendment guarantee of counsel for indigent defendants in felony cases); Ker v. California, 374 U.S. 23, 34, *442 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963) (confirming that the Fourth Amendment protection against unreasonable searches and seizures apply to the states); Malloy v. Hogan, 378 U.S. 1, 10-11, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964) (incorporating the Fifth Amendment protection against compelled self-incrimination); Aguilar v. Texas, 378 U.S. 108, 110, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) ("[T]he standard for obtaining a search warrant is [] ‘the same under the Fourth and Fourteenth Amendments.' " (quoting Ker, 374 U.S. at 33, 83 S.Ct. 1623)), abrogated by Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); Pointer v. Texas, 380 U.S. 400, 403, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965) (incorporating the Sixth Amendment right of an accused to confront prosecution witnesses); Parker v. Gladden, 385 U.S. 363, 364, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966) (incorporating the Sixth Amendment right to trial by an impartial jury); Klopfer v. North Carolina, 386 U.S. 213, 222-23, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967) (incorporating the Sixth Amendment right to a speedy trial); Washington v. Texas, 388 U.S. 14, 19-20, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967) (incorporating the Sixth Amendment right to have compulsory process for obtaining defense witnesses); Duncan v. Louisiana, 391 U.S. 145, 149, 158, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968) (incorporating the Sixth Amendment right to a trial by jury in all criminal cases, except for ‘‘petty” offenses); Benton v. Maryland, 395 U.S, 784, 796, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969) (incorporating the Fifth Amendment protection against double jeopardy); see also Jerold H. Israel, Selective Incorporation: Revisited, 71 Geo. L.J. 253, 296 (1982) ("The decisions of the 1960's had selectively incorporated all but four of the Bill of Rights guarantees relating to the criminal justice process: public trial, notice of charges, prohibition of excessive bail, and prosecution by indictment.").

. See Woodson, 428 U.S. at 291, 96 S.Ct. 2978.

. See State v. Dickerson, 298 A.2d 761, 764 n.6 (Del. 1972); Hugo Adam Bedau, The Death Penalty in America, 35 Fed. Probation 32, 32 (1971); Valerie P. Hans et al., The Death Penalty: Should the Judge or the Jury Decide Who Dies, 12 J. Empirical L. Stud. 70, 73 (2015); Glenn W. Samuelson, Why Was Capital Punishment Restored in Delaware?, 60 J. Crim. L. & Criminology 148, 148 (1969).

. See 29 Del. C. ch. 266 (1917); see also State v. Thomas, 111 A. 538, 539 (Del. 1920); State v. Carey, 178 A. 877, 878 (Del. O. &. T. 1935).

. See Dickerson, 298 A.2d at 764 n.6.

. See id.

. See Woodson, 428 U.S. at 289, 96 S.Ct. 2978; see also Sheri Lynn Johnson et al., The Delaware Death Penalty: An Empirical Study, 97 Iowa L. Rev. 1925, 1929 (2012).

. See Andres, 333 U.S. at 758, 68 S.Ct. 880 (Frankfurter, J., concurring) ("In three States a jury’s recommendation of life imprisonment is not binding on the trial court: Delaware, New Mexico, and Utah.”). It appears that there was only one instance in which a trial judge imposed death when a jury recom *443 mended mercy, and that sentence was overturned on other grounds; depriving this Court of the chance to address whether that judicial override was proper. See Jenkins v. State, 230 A.2d 262, 265 & n.1 (Del. 1967).

. Woodson, 428 U.S. at 291-92, 96 S.Ct. 2978; see also Andres, 333 U.S. at 759, 68 S.Ct. 880 (Frankfurter, J., concurring); Brief for the United States as Amicus Curiae at 36, McGautha v. California, 402 U.S. 183 (1971).

. 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

. Id. at 519, 88 S.Ct. 1770.

. See id. at 525-27 & nn. 2-8, 88 S.Ct. 1770; Bryan A. Stevenson, The Ultimate Authority on the Ultimate Punishment, 54 Ala. L. Rev. 1091, 1140 (2003); see also Johnson v. Texas, 509 U.S. 350, 359, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993); Lockett v. Ohio, 438 U.S. 586, 597-98, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); Stephen P. Garvey, "As the Gentle Rain From Heaven”: Mercy in Capital Sentencing, 81 Cornell L. Rev. 989, 996 (1996); Susan R. Klein & Jordan M. Steiker, The Search for Equality in Criminal Sentencing, 2002 Sup. Ct. Rev. 223, 262-65; Lillquist, supra note 6, at 648; infra note 228 and accompanying text.

. 391 U.S. 145, 88 S.Ct. 1444.

. See id. at 149, 88 S.Ct. 1444; see also Parker, 385 U.S. at 364, 87 S.Ct. 468.

. Stephen F. Smith, The Supreme Court and the Politics of Death, 94 VA. L. REV. 283, 287 (2008); see also Lain, supra note 28, at 18.

. 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971), overruled by Crampton v. Ohio, 408 U.S. 941, 92 S.Ct. 2873, 33 L.Ed.2d 765 (1972).

. Id. at 207-08, 91 S.Ct. 1454.

. See Andrea D. Lyon, The Death Penalty, What's Keeping It Alive 7 (2014); Sam Kamin & Justin Marceau, Waking the Furman Giant, 48 U.C. Davis L. Rev. 981, 990 (2015); Lain, supra note 28, at 18-19.

. See Lockett, 438 U.S. at 598, 98 S.Ct. 2954; Smith, supra note 48, at 288-91; Kamin & Marceau, supra note 51, at 986-87; James S. Liebman, Slow Dancing With Death: The Supreme Court and Capital Punishment, 1963-2006, 107 Colum. L. Rev. 1, 23 (2007).

. See Furman, 408 U.S. at 239, 92 S.Ct. 2726.

. See id. at 240, 92 S.Ct. 2726 (Douglas, J., concurring).

. See id.’, Bryan A. Stevenson, The Politics of Fear and Death: Successive Problems in Capital Federal Habeas Corpus Cases, 77 N.Y.U. L. Rev. 699, 716 n.80 (2002).

. Lain, supra note 28, at 16-17.

. Furman, 408 U.S. at 239, 92 S.Ct. 2726.

. Id. at 239-40, 92 S.Ct. 2726 (emphasis added).

. See Lain, supra note 28, at 10-11.

. See Furman, 408 U.S, at 256-57, 92 S.Ct. 2726 (Douglas, J., concurring); id. at 308, 310, 92 S.Ct. 2726 (Stewart, J., concurring); id. at 310-11, 313, 92 S.Ct. 2726 (White, J„ concurring).

. 6 LaFave, et al,, supra note 12, § 26.1(b), at 671.

. See Furman, 408 U.S. at 305, 92 S.Ct. 2726 (Brennan, J., concurring); id. at 369, 92 S.Ct. 2726.(Marshall, J., concurring).

. Gregg, 428 U.S. at 189, 96 S.Ct. 2909; see also Zant v. Stephens, 462 U.S. 862, 876-77, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); Douglass, supra note 6, at 1994.

. Woodson, 428 U.S. at 285, 96 S.Ct. 2978 (emphasis added); see also Eddings v. Oklahoma, 455 U.S. 104, 110-12, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); Douglass, supra note 6, at-1995.

. Smith, supra note 48, at 288; Franklin E. Zimring & Gordon Hawkins, Capital Punishment and the American Agenda 41 (1986); Liebman, supra note 52, at 23.

. See Baze v. Rees, 553 U.S. 35, 88, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008) (Scalia, J., concurring); Lain, supra note 28, at 19,

. Lain, supra note 28, at 45; see also Furman, 408 U.S. at 313, 92 S.Ct. 2726 (White, J., concurring); Lee Epstein & Joseph F. Kobyl-ka, The Supreme Court and Legal Change: Abortion and the Death Penalty 81 (1992); Arthur J, Goldberg, The Death Penalty and the Supreme Court, 15 Ariz. L. Rev. 355, 367 (1973).

. See Callins v. Collins, 510 U.S. 1141, 1144, 114 S.Ct. 1127, 127 L.Ed.2d 435 (1994) (Scalia, J., concurring).

. See Lain, supra note 28, at 47-49; Smith, supra note 48, at 290; Zimring & Hawkins, supra note 65, at 39.

. See Stephen Gillers, Deciding Who Dies, 129 U. Pa. L. Rev. 1, 17-18, 43 (1980) (eight states switched from jury sentencing to judge sentencing after Furman).

. See Lain, supra note 28, at 56-57.

. See Poulos, supra note 10, at 186.

. See Liebman, supra note 52, at 10.

. See id.) Douglass, supra note 6, at 1994.

. 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).

. See Liebman, supra note 52, at 28.

. Lain, supra note 28, at 55 n.317.

. See Gregg, 428 U.S. at 168-69, 96 S.Ct. 2909.

. See id.

. Id. at 169, 96 S.Ct. 2909; see also Jurek v. Texas, 428 U.S. 262, 268, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976).

. Gregg, 428 U.S. at 187, 96 S.Ct. 2909; see also Kansas v. Marsh, 548 U.S. 163, 173-74, 126 S.Ct. 2516, 165 L.Ed.2d 429 (2006).

. 428 U.S. 280, 96 S.Ct. 2978.

. Id. at 289, 293, 96 S.Ct. 2978; see also Roberts v. Louisiana, 428 U.S. 325, 335-36, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976) (same).

. Id. at 303, 96 S.Ct. 2978.

. Id.

. Id. at 304-05, 96 S.Ct. 2978.

. See id. at 287 n.7, 96 S.Ct. 2978; id. at 292 n.25, 96 S.Ct. 2978.

. See Sumner v. Shuman, 483 U.S. 66, 77-78, 107 S.Ct. 2716, 97 L.Ed.2d 56 (1987).

. See, e.g., Margaret Jane Radin, The Jurisprudence of Death: Evolving Standards for the Cruel and Unusual Punishments Clause, 126 U. Pa. L. Rev. 989, 999 (1978); Death Penalty, 90 Harv. L. Rev. 63, 64, 69 (1976).

. 428 U.S. 262, 96 S.Ct. 2950.

. Id. at 271, 96 S.Ct. 2950; see also Wood-son, 428 U.S. at 303-04, 96 S.Ct. 2978; Lockett, 438 U.S. at 605, 98 S.Ct. 2954; Douglass, supra note 6, at 1994-95.

. Jurek, 428 U.S. at 271, 96 S.Ct. 2950.

. 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976).

. Id. at 252, 96 S.Ct. 2960.

. See supra note 47 and accompanying text.

. See Johnson v. Texas, 509 U.S. 350, 360, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993).

. See Douglass, supra note 6, at 2024-25 (discussing this issue).

. See supra notes 82-89 and accompanying text.

. See supra notes 63-64 and accompanying text.

. Douglass, supra note 6, at 1995; see also id. at 2020.

. See Gregg, 428 U.S. at 173, 96 S.Ct. 2909; Enmund v. Florida, 458 U.S. 782, 815, 102 S.Ct. 3368, 73 L,Ed.2d 1140 (1982) (same); Weeks v. State, 653 A.2d 266, 270 (Del. 1995).

. See, e.g., Coker v. Georgia, 433 U.S. 584, 596, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977); Clark v. State, 672 A.2d 1004, 1010 (Del. 1996).

. See Douglass, supra note 6, at 1984; Stevenson, supra note 45, at 1140.

. See Liebman, supra note 52, at 30-34.

. 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984), overruled by Hurst v. Florida, — U.S. -, 136 S,Ct. 616, 193 L.Ed.2d 504 (2016).

. See id. at 451, 104 S.Ct. 3154..

. Id. at 457-58, 104 S.Ct. 3154.

. See, e.g., Strickland v. Washington, 466 U.S. 668, 686-87, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (holding that criminal defendants have a right to effective assistance of counsel at "[a] capital sentencing proceeding” because such a proceeding "is sufficiently like a trial in its adversarial format and in the existences of standards for decision”); Mempa v. Rhay, 389 U.S. 128, 134, 88 S.Ct. 254, 19 L.Ed.2d 336 "(1967) (explicitly extending the Sixth Amendment right to counsel to sentencing); see also White, supra note 13, at 18 n.145 ("Prior to Spaziano, the Court had decided a series of cases holding that procedural protections at the guilt stage are also applicable at the penalty stage. See, e.g., Estelle v. Smith, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981) (privilege against self-incrimination and right to counsel under Massiah); Bullington v. Missouri, 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981) (double jeopardy); Gardner v. Florida, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977) (right to confront and rebut government evidence).”).

. Spaziano, 468 U.S. at 465, 104 S.Ct. 3154; see also id. at 464, 104 S.Ct. 3154.

. Id. at 458-59, 104 S.Ct. 3154 (citations omitted) (quoting Bullington v. Missouri, 451 U.S. 430, 445, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981)) (internal quotation marks omitted).

. Spaziano, 468 U.S. at 464, 104 S.Ct. 3154.

. 490 U.S. 638, 109 S.Ct. 2055, 104 L.Ed.2d 728 (1989), overruled by Hurst v. Florida, — U.S. -, 136 S.Ct. 616, 193 L.Ed.2d 504(2016).

. White, supra note 13, at 18.

. Hildwin, 490 U.S. at 640-41, 109 S.Ct. 2055.

. Id. at 640, 109 S.Ct. 2055 (emphasis added); see also White, supra note 13, at 18-19.

. 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990).

. See id. at 745, 110 S.Ct. 1441.

. See id.

. 497 U.S. 639, 110 S.Ct. 3047, overruled by Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

. See id. at 648, 110 S.Ct. 3047.

. Id. at 649, 110 S.Ct. 3047.

. See id. at 650, 110 S.Ct. 3047.

. 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995).

. Id. at 505, 115 S.Ct. 1031.

. Id. at 509, 115 S.Ct, 1031 (quoting Tedder v. State, 322 So.2d 908, 910 (Fla. 1975)).

. See id. at 511, 115 S.Ct. 1031.

. Id. at 515, 115 S.Ct. 1031,

. See supra note 15 and accompanying text.

. See Harris, 513 U.S. at 516-17, 115 S.Ct. 1031 (Stevens, J., dissenting).

. See supra notes 85-92 and accompanying text.

. See, e.g., Zant, 462 U.S. at 879, 103 S.Ct. 2733.

. See, e.g., Kansas v. Can, — U.S. -, 136 S.Ct, 633, 642, 193 L.Ed.2d 535 (2016); Jones v. United States, 527 U.S. 373, 381, 119 S.Ct. 2090, 144 L,Ed.2d 370 (1999).

. 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980).

. 486 U.S. 356, 108 S.Ct. 1853, 100 L,Ed.2d 372 (1988).

. See Godfrey, 446 U.S. at 433, 100 S.Ct. 1759; Maynard, 486 U.S. at 363-64, 108 S.Ct. 1853; see also White, supra note 13, at 20 n.160.

. See Garvey, supra note 45, at 1035; Smith, supra note 48, at 297-98.

. See Brown v. Sanders, 546 U.S. 212, 216 n.2, 126 S.Ct. 884, 163 L.Ed.2d 723 (2006) ("Our cases have frequently employed the terms ‘aggravating circumstance’ or ‘aggravating factor' to refer to those statutory factors which determine death eligibility in satisfaction of Furman s narrowing requirement. This terminology becomes confusing when, as in this case, a State employs the term 'aggravating circumstance’ to refer to factors that play a different role, determining which defendants eligible for the death penalty will actually receive that penalty. To avoid confusion, this opinion will use the term ‘eligibility factor’ to describe a factor that performs the constitutional narrowing function.” (emphasis in original) (citations omitted)).

. See Robert J. Smith, Forgetting Furman, 100 Iowa L. Rev. 1149, 1160 (2015); Jeffrey L. Kirchmeier, Casting a Wider Net: Another Decade of Legislative Expansion of the Death Penalty in the United States, 34 PEPP. L. REV. 1, 25 (2006); James S. Liebman & Lawrence C. Marshall, Less is Better: Justice Stevens and the Narrowed Death Penalty, 74 Fordham L. Rev, 1607, 1649 (2006).

. See 11 Del. C. § 4209(e)(1).

. Smith, supra note 48, at 364-65.

. See Douglass, supra note 6, at 1994-95.

. See supra notes 83-84 and accompanying text.

. See Hans et al., supra note,36, at 75 (the General Assembly eliminated the unanimity requirement from § 4209 because the jury in a highly publicized murder case could not agree unanimously on death for any of the four defendants); Joseph T. Walsh, The Limits of. Proportionality Review in Death Penalty Cases, 21 Del. Law. 13, 14 (2004). This Court upheld that amendment in State v. Cohen, 604 A.2d 846 (Del. 1992).

. Johnson et al., supra note 40, at 1954.

. See Apprendi, 530 U.S. at 469-70, 120 S.Ct. 2348.

. See id. at 470-71, 120 S.Ct. 2348.

. Id. at 469, 120 S.Ct. 2348 (quoting N.J. Stat. Ann. § 2C:44-3(e) (West Supp. 1999— 2000)) (internal quotation marks omitted).

. See id. at 471, 120 S.Ct. 2348.

. See id. at 469, 120 S.Ct. 2348.

. Id. at 490, 120 S.Ct. 2348.

. 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004).

. Id. at 303-04, 124 S.Ct. 2531 (emphasis in original).

. 536 U.S. 584, 122 S.Ct. 2428.

. See W. David Ball, Heinous, Atrocious, and Cruel: Apprendi, Indeterminate Sentencing, and the Meaning of Punishment, 109 Co-lum. L. Rev. 893, 896-97 (2009).

. See supra notes 119-122 and accompanying text.

. Ring, 536 U.S. at 589, 122 S.Ct. 2428.

. Id. at 602, 122 S.Ct. 2428.

. Id. at 609, 122 S.Ct. 2428.

. Id. (internal citation omitted) (quoting Apprendi, 530 U.S. at 494 n.19, 120 S.Ct. 2348).

. See Brice v. State, 815 A.2d 314, 320 (2003).

. See 11 Del. C. § 4209(d) (1991); S.B. 79, 137th Gen. Assemb., Reg. Sess. (Del. 1991); S.B. 449, 141st Gen. Assemb., Reg. Sess. (Del. 2002).

. See 11 Del. C. § 4209(d)(1)(a) (1991).

. See id. § 4209(d)(1)(b).

. See id. § 4209(g).

. Ring, 536 U.S, at 608 n.6, 122 S.Ct, 2428.

. Brice v. State, 815 A.2d 314, 320 (Del. 2003); see also House Debate on S.B. 449, 141st Gen. Assembly (Del. 2002) (statement on behalf of the Delaware Department of Justice); Senate Debate on S.B. 449, 141st Gen. Assembly (Del. 2000) (statement on behalf of the Delaware Department of Justice).

. 815 A,2d 327 (Del. 2003).

. Id. at 343.

. See supra note 143 and accompanying text.

. Michael L. Radelet, Overriding Jury Sentencing Recommendations in Florida Capital Cases: An Update and Possible Half-Requiem, 2011 Mich. St. L. Rev. 793, 800.

. 11 Del. C. § 4209(c)(3).

. Id. § 4209(c)(3)(b)(l); see also id. § 4209(e)(1).

. Id. § 4209(d)(2).

. Id. § 4209(d)(1).

. Swan v. State, 28 A.3d 362, 390 (Del. 2011); see also Reyes v. State, 819 A.2d 305, 317 (Del. 2003).

. 11 Del. C. § 4209(c)(3)(a)(2).

. Id. § 4209(d)(1).

. Id.

. 815 A.2d 314.

. Id. at 322 (internal citations omitted); see also Swan, 28 A.3d at 390; Ortiz v. State, 869 A.2d 285, 305-06 (Del. 2005); Reyes, 819 A.2d at 316; Norcross v. State, 816 A.2d 757, 767 (Del. 2003).

. Brice, 815 A.2d at 322.

. Id.

. Ring, 536 U.S. at 612-13, 122 S.Ct. 2428 (Scalia, J., concurring).

. See Hurst, 136 S.Ct. at 619.

. Id. at 620 (quoting Fla. Stat. § 921.141(2) (2015)); see also Robin Maher, Hurst v. Florida: How Much Does the Sixth Amendment Really Protect?, Geo. Wash. L. Rev. Docket (Jan. 17, 2016), http://www.gwlr.orgdiurst-v-florida-how-much-does-the-sixth-amendment-reallyprotect/; Judith L. Ritter, Time to Rethink Delaware’s Death Penalty?, 34 Del. Law. 1, 15 (2016).

. See 11 Del. C. § 4209(c)-(d).

. Ritter, supra note 185, at 16.

. Hurst, 136 S.Ct. at 620 (quoting Fla. Stat. § 775.082(1)) (emphasis in original).

. Hurst, 136 S.Ct. at 619.

. Id. at 621.

. Id. at 622 (emphasis added).

. Id. at 623.

. Id. (internal quotation marks omitted),

. See, e.g., Woodward v. Alabama, — U.S. -, 134 S.Ct. 405, 407, 187 L.Ed.2d 449 (2013) (Sotomayor, J., dissenting from denial of cert.) (calling for reconsideration of Spazi-ano)-, Harris, 513 U.S, at 524-26, 115 S.Ct. 1031 (Stevens, J., dissenting).

. Hurst, 136 S.Ct. at 621-22.

. Id. at 619 (emphasis added).

. See Woodward, 134 S.Ct. at 410-11 (Sotomayor, J., dissenting from denial of cert.).

. See Apprendi, 530 U.S. at 555, 120 S.Ct. 2348 (Breyer, J., dissenting); Ring, 536 U.S. at 613, 122 S.Ct. 2428 (Breyer, J., dissenting).

. Hurst, 136 S.Ct. at 624 (quoting Ring, 536 U.S. at 614, 122 S.Ct. 2428 (Breyer, J., dissenting)).

. See Ring, 536 U.S. at 618, 122 S.Ct. 2428 (Breyer, J., dissenting) (quoting Spaziano, 468 U.S. at 469, 104 S.Ct. 3154 (Stevens, J., concurring in part and dissenting in part)).

. See id. at 616, 122 S.Ct. 2428.

. See Hurst, 136 S.Ct. at 625 (Alito, J., dissenting).

. Id.

. Johnson v. Alabama, — U.S. -, 136 S.Ct. 1837, 194 L.Ed.2d 828 (2016); Wimbley v. Alabama, — U.S. -, 136 S.Ct. 2387, 195 L.Ed.2d 760 (2016); Kirksey v, Alabama, — U.S. -, 136 S.Ct. 2409, 195 L.Ed.2d 777 (2016).

. Woodward, 134 S.Ct. at 407 (Sotomayor, J., dissenting from denial of cert,); Ross Kleinstuber, "Only a Recommendation": How Dela *462 ware Capital Sentencing Law Subverts Meaningful Deliberations and Jurors’ Feelings of Responsibility, 19 Widener L. Rev. 321, 325 (2013).

. Hurst, 136 S.Ct. at 619.

. See, e.g., Br. of Charles Hamilton Houston Institute for Race and Justice at 9-12 (hereinafter "C. H. Houston Br.”).

. U.S. Const, amend. VI.

. See ll Del C. § 4209(c)-(d).

. Id. § 4209(c)(3).

. See, e.g., Zebroski v. State, 715 A.2d 75, 84 (Del. 1998) (“The balancing of aggravating and mitigating circumstances is not a quantitative exercise, but rather a reasoned judgment as to what factual situations require the imposition of death and which can be satisfied by life imprisonment in light of the totality of the circumstances present.” (emphasis added) (internal quotation marks omitted)); Ferguson v. State, 642 A.2d 772, 782 (Del. 1994) ("The weighing of aggravating and mitigating circumstances involves a qualitative rather than a quantitative consideration of the circumstances to determine the appropriate punishment. That qualitative process requires that the jury and the judge carefully consider the specific facts of each case and, when appropriate, not to give one or more aggravating factors independent weight.” (internal quotation marks omitted) (footnotes omitted)).

. Cunningham v. California, 549 U.S. 270, 279, 127 S.Ct. 856, 166 L.Ed.2d 856 (2007); see also Campbell, supra note 31, § 9.3 at 354-59.

. Hurst, 136 S.Ct. at 619.

. See Woodson, 428 U.S. at 289-93, 96 S.Ct. 2978; McGautha v. California, 402 U.S. at 200 nn. 10, 11, 91 S.Ct. 1454; see also Green, supra note 17, at 421-25.

. Because I admit that Hurst can be read more than one way, I understand why my respected colleague in dissent views Hurst as simply an application of Ring, and as a case-specific ruling that a jury must make all findings necessary to make a defendant eligible for the death penalty.

. See Kleinstuber, supra note 205, at 329; see also The Declaration of Independence para. 3 (U.S. 1776) (listing among the reasons for separation from England: "For depriving us in many cases, of the benefits of Trial by Jury.”); Letter from Thomas Jefferson to Thomas Paine (1789) ("I consider trial by jury as the only anchor yet imagined by man, by which a government can be held to the principles of its constitution.”); Thomas Jefferson, Notes on the State of Virginia 140 (J.W. Randolph ed., 1853) ("[I]f the question relate to any point of public liberty, or if it be one in which the judges may be suspected of bias, the jury undertake to decide both law and fact.”); Statement of John Adams (1774) ("Representative government and trial by jury are the heart and lungs of liberty.”); The Federalist No. 83 (Alexander Hamilton) ("The friends and adversaries of the plan of the convention, if they agree in nothing else, concur at least in the value they set upon the trial by jury.... ”); Georgia v. Brailsford, 3 U.S. (3 Dall.) 1, 4, 1 L.Ed. 483 (1794) (Chief Justice John Jay instructed the jury; “It may not be amiss, here, Gentlemen, to remind you of the good old rule, that on questions of fact, it is the province of the jury, on questions of law, it is the province of the court to decide. But it must be observed that by the same law, which recognizes this reasonable distribution of jurisdiction, you have nevertheless a right to take upon yourselves to judge of both, and to determine the law as well as the fact in controversy. On this,' and on every other occasion, however, we have no doubt, you will pay that respect, which is due to the opinion of the court; For, as on the one hand, it is presumed, that juries are the best judges of facts; it is, on the other hand, presumable, that the court are the best judges of law. But still both objects are. lawfully, within your power of decision.”); Zylstra v. Corp. of Charleston, 1 S.C.L. 382, 389 1794 ("[T]he trial by jury is a common law right; not the creature of the constitution, but originating in time immemorial; it is the inheritance of every individual citizen, the title to which commenced long before the political existence of this society; and which has been held and used inviolate by our ancestors in succession from that period to our own time; having never been departed from, except in the instances before mentioned. This right then, is as much out of the reach of any law, as the property of the citizen; and the legislature has no more authority to take it away, than it has to resume a grant of land which has been *466 held for ages.”); Klein & Steiker, supra note 45, at 265 ("Throughout this country’s history, judge sentencing has been the norm in the non-capital context, and jmy sentencing has been the norm in capital cases.”); Hoffman, supra nóte 6, at 967; Roger Roots, The Rise and Fall of the American Jury, 8 Seton Hall Circuit Rev. 1, 6 (2011) (" 'When courts exercised their properly judicial (as opposed to administrative) functions, the decision-makers were juries. The most striking feature of colonial sentencing was the bare modicum of authority that judges actually exercised.’ ” (quoting Jack N. Rakove, Original Meanings: Politics and the Ideas in the Making of the Constitution 30 (1996))).

. See Woodward, 134 S.Ct. at 407 (Sotomayor, dissenting from denial of cert.) (citations omitted); 6 LaFave. et al., supra note 12, § 26.2(b), at 699; see also Lillquist, supra note 6, at 650.

. See, e.g., Ring, 536 U.S. at 610, 122 S.Ct. 2428 (Scalia, J. concurring).

. See supra note 84 and accompanying text.

. See supra notes 85, 91-92 and accompanying text.

. 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

. See Garvey, supra note 45, at 997-98; Liebman, supra note 52, at 28; supra and accompanying text.

. See Johnson et al., supra note 40, at 1931; Hans et al., supra note 36, at 73-78 (same).

. See supra notes 13-15, 45 and accompanying text.

. See, e.g., Smith, supra note 52, at 287-91; Lillquist, supra note 6, at 641-52; The Changing Role of the Jury in the Nineteenth Century, 74 Yale L.J. 170, 170-74 (1964).

. See, e.g., Woodson, 428 U.S. at 289-93, 96 5.Ct. 2978 (Stewart, J.); Hoffman, supra note 6, at 963-68.

. 172 U.S. 303, 19 S.Ct. 212, 43 L.Ed. 456 (1899).

. Id. at 313, 19 S.Ct. 212.

. See supra note 44 and accompanying text.

. Witherspoon, 391 U.S. at 519, 88 S.Ct. 1770; see also Furman, 408 U.S. at 439-40, 92 S.Ct. 2726 (Powell, J., dissenting); Gregg, 428 U.S. at 181, 96 S.Ct. 2909.

. See Winston, 172 U.S. at 313, 19 S.Ct. 212; see also Carr, 136 S.Ct. at 642; Andres, 333 U.S. at 753-54, 68 S.Ct. 880 (Frankfurter, J., concurring); Garden, 815 A.2d at 344; White, supra note 13, at 30-31.

. 2 The Miscellaneous Essays and Occasional Writings of Francis Hopkinson, Esq. 101-02 (1792).

. 6 LaFave, et al., supra note 12, § 26.2(b), at 699.

. Proffitt, 428 U.S. at 251, 96 S.Ct. 2960; see also Schriro v. Summerlin, 542 U.S. 348, 361-62, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004) (Breyer, J. dissenting).

. Proffitt, 428 U.S. at 251, 96 S.Ct. 2960.

. See Carr, 136 S.Ct. at 642; Stevenson, supra note 45, at 1121.

. See 24 C.J.S. Criminal Law § 2374 West-law (database updated 2016); see also Caldwell v. Mississippi, 472 U.S, 320, 340 n.7, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985); Dorszynski v. United States, 418 U.S. 424, 431, 94 S.Ct. 3042, 41 L.Ed,2d 855 (1974); 3 Charles Alan Wright et al., Fed. Prac. & Proc. Crim. § 552 (4th ed. 2016).

. See Gregg, 428 U.S. at 190, 96 S.Ct, 2909; Ring, 536 U.S, at 616, 122 S.Ct. 2428 (Breyer, J., concurring); Harris, 513 U.S. at 526, 115 S.Ct. 1031 (Stevens, J., dissenting); Gillers, supra note 70, at 89; Mandery, supra note 8, at 164 (internal quotation marks omitted); see also Woodward, 134 S.Ct. at 410 (Sotomayor, J., dissenting from denial of cert.).

. E.g., Quick Facts: Mandatory Minimum Penalties, 28 Fed.Sent.R. 217, 217 (2016) (of the nearly 76,000 cases reported to the U.S, Sentencing Commission in 2014, offenders in 23.6% of cases were "convicted of an offense carrying a mandatory minimum penalty,” and at sentencing, 13.6% of offenders "remained subject to a mandatory minimum penalty”).

. Many cases stand for this proposition. E.g., Streetman v. Lynaugh, 484 U.S. 992, 995, 108 S.Ct. 588, 98 L.Ed.2d 634 (1988); Ford v. Wainwright, 477 U.S. 399, 411, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986); see also Beck v. Alabama, 447 U.S. 625, 637, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980); Rummel v. Estelle, 445 U.S. 263, 272, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980); Gardner v, Florida, 430 U.S. 349, 357-58, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977); Harmelin v. Michigan, 501 U.S. 957, 993-94, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991); Pennell v. State, 604 A.2d 1368, 1375 (Del. 1992); see also Scott W. Howe, The Futile Quest for Racial Neutrality in Capital Selection and the Eighth Amendment Argument for Abolition Based on Unconscious Racial Discrimination, 45 Wm. & Mary L. Rev. 2083, 2157 (2004).

. See Glossip v. Gross, - U.S. -, 135 S.Ct. 2726, 2759-64, 192 L.Ed.2d 761 (2015); Wright v. State, 633 A.2d 329, 336-37 (Del. 1993) (same).

. See Gilmore v. Taylor, 508 U.S. 333, 342, 113 S.Ct. 2112, 124 L.Ed.2d 306 (1993); Murray v. Giarratano, 492 U.S. 1, 8-9, 109 S.Ct. 2765, 106 L,Ed.2d 1 (1989) (quoting Lockett, 438 U.S. at 604, 98 S.Ct. 2954) (internal citations omitted); Ake v. Oklahoma, 470 U.S. 68, 86, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985) (Burger, C.J., concurring); Walton, 497 U.S. at 657, 110 S.Ct. 3047 (Scalia, J., dissenting).

. See Williams v. Taylor, 529 U.S. 362, 396-99, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); Wiggins v. Smith, 539 U.S. 510, 523-25, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003); Rompilla v. Beard, 545 U.S. 374, 388-89, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005); Douglass, supra note 6, at 1986-87.

. See Coker v. Georgia, 433 U.S. 584, 592, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977).

. See Eberheart v. Georgia, 433 U.S. 917, 917, 97 S.Ct. 2994, 53 L.Ed.2d 1104 (1977).

. See Enmund, 458 U.S. at 798-801, 102 S.Ct. 3368; see also Harmelin, 501 U.S. at 994, 111 S.Ct. 2680.

. See Kennedy v. Louisiana, 554 U.S. 407, 412, 128 S.Ct. 2641, 171 L.Ed.2d 525 (2008).

. Ford v. Wainwright, 477 U.S. 399, 410, 106 S.Ct 2595, 91 L.Ed.2d 335 (1986).

. Atkins v. Virginia, 536 U.S. 304, 321, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).

. See Roper v. Simmons, 543 U.S. 551, 568, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005); see also Thompson v. Oklahoma, 487 U.S. 815, 838, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988).

. See Green v. Georgia, 442 U.S. 95, 97, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979).

. See Lockett v. Ohio, 438 U.S. 586, 605, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality).

. See Beck, 447 U.S. at 627, 100 S.Ct. 2382; see also Powell v. Alabama, 287 U.S. 45, 71, 53 S.Ct. 55, 77 L.Ed. 158 (1932) ("[I]n a capital case, where the defendant is unable to employ counsel, and is incapable adequately of maldng his own defense because of ignorance, feeble-mindedness, illiteracy, or the like, it is the duty of the court, whether requested or not, to assign counsel for him as a necessary requisite of due process of law; and that duty is not discharged by an assignment at such a time or under such circumstances as to preclude the giving of effective aid in the preparation and trial of the case.”); Williams v. Florida, 399 U.S. 78, 103, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970) (holding that the Sixth Amendment does not require the use of a jury of twelve in noncapital cases); Gardner, 430 U.S. at 362, 97 S.Ct. 1197 (holding that a death sentence imposed even in part upon information which the offender had no opportunity to deny or explain violates the defendant's due process); Roberts v. Louisiana, 431 U.S. 633, 637-38, 97 S.Ct. 1993, 52 L.Ed.2d 637 (1977) (holding that mandatory death penalty for a particular crime violates the Eighth Amendment); Presnell v. Georgia, 439 U.S. 14, 15-17, 99 S.Ct. 235, 58 L.Ed.2d 207 (1978) (per curiam) (holding that death sentence cannot be based on an aggravating factor that was previously used to establish guilt); Godfrey v. Georgia, 446 U.S. 420, 428-29, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) (because of the death penalty's unique nature, the Constitution requires that states clearly define the aggravating factors that can result in death sentences); Caldwell v. Mississippi, 472 U.S. 320, 341, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) (the Eighth Amendment prohibits a death sentence determination to be made by a jury which is told that the ultimate responsibility for determining the appropriateness of death rests with appellate courts); Turner v. Murray, 476 U.S. 28, 36-37, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986) (because of "the special seriousness of the risk of improper sentencing in a capital case,” "a capital defendant accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias”); Sumner, 483 U.S. at 77, 107 S.Ct. 2716 (answering question that was expressly reserved in Roberts v. Louisiana and holding that the Eighth Amendment prohibits a mandatory death sentence for murder in prison by an inmate serving a life sentence); Burger v. Kemp, 483 U.S. 776, 785, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987) (“Our duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case.”); Mills v. Maryland, 486 U.S. 367, 377, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988) (“In reviewing death sentences, the Court has demanded even greater certainty that the jury’s conclusions rested on proper grounds.”); Lankford v. Idaho, 500 U.S. 110, 127, 111 S.Ct. 1723, 114 L.Ed.2d 173 (1991) (defendant’s “lack of adequate notice that the judge was contemplating the imposition of the death sentence” violated the defendant’s constitutional rights); Simmons v. South Carolina, 512 U.S. 154, 168-69, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994) (when a capital defendant’s future dangerousness is at issue and the only alternative sentence to death is life imprisonment without possibility of parole, the defendant has the right to inform the jury of her ineligibility of parole); see also 1 La-Fave, et al., supra note 12, § 1.8(e), at 415-17; 6 LaFave, et al., supra note 12, § 26.1(b), at 673-76.

. For an overview of how the review of capital sentences is treated differently than the review of non-capital sentences, a topic which the U.S. Supreme Court has not directly spoken about but which state courts have addressed, see 24 C.J.S. Criminal Law §§ 2374-75 Westlaw (database updated 2016); see also Arthur W. Campbell, Law of Sentencing § 14.4, at 579-82 (3d ed. 2004).

. See Gillers, supra note 70, at 18 ("[Ejach of the eight states currently opting for judge sentencing made that choice after Furman. Each had previously embraced jury sentencing in some form. Their adoption of judge sentencing is an apparent attempt to meet Furmans unclear commands.”); Ritter, supra note 185, at 16 (“There is a rational argument that Apprendi requires jury verdicts for all aggravating circumstances because these factual findings expose a defendant to a death rather than a life sentence.”).

. See Stevenson, supra note 45, at 1103 (“Looking back on the entire line of pre-Ring cases on the right to juiy sentencing in capital cases, it is apparent that the die was indelibly cast in Proffitt [v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976)] and Spaziano.”).

. See David A. Strauss, Foreword: Does the Constitution Mean What It Says?, 129 Harv. L. Rev. 1, 29 (2015) (“Implicit in all of this [discussion of constitutional interpretation] is Chief Justice Marshall's famous statement that 'it is a constitution we are expounding.’ We should not expect to treat the Constitution as if it were any ordinary text. But Chief Justice Marshall's dictum is just the starting point. The idea is to see, as best we can, what we are doing when we ‘expound’ the Constitution. Expounding the U.S. Constitution means operating in a mixed system that comprises precedent as well as the text, and in which provisions of the Constitution often, as I have suggested, seem to function roughly in the same way as precedents.” (quoting McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 407, 4 L.Ed. 579 (1819)) (emphasis in original)); see also Duncan, 391 U.S. at 155— 56, 88 S.Ct. 1444 (“The guarantees of jury trial in the Federal and State Constitutions reflect a profound judgment about the way in which law should be enforced and justice administered. A right to jury trial is granted to criminal defendants in order to prevent oppression by the Government. Those who wrote our constitutions knew from history and experience that it was necessary to protect against unfounded criminal charges brought to eliminate enemies and against judges too responsive to the voice of higher authority. The framers of the constitutions strove to create an independent judiciary but insisted upon further protection against arbitrary action. Providing an accused with the right to be tried by a jury of his peers gave him an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge. If *472 the defendant preferred the common-sense judgment of a jury to the more tutored but perhaps less sympathetic reaction of the single judge, he was to have it. Beyond this, the jury trial provisions in the Federal and State Constitutions reflect a fundamental decision about the exercise of official power — a reluctance to entrust plenary powers over the life and liberty of the citizen to one judge or to a group of judges.”).

. See Douglass, supra note 6, at 1985 (“The Court’s Sixth Amendment ruling is remarkable for its brevity and, I suggest, for its shallow analysis. The portion of the opinion dealing with the Sixth Amendment occupies only two paragraphs. It makes no mention of the constitutional text. It says nothing of the history, origin, and purpose of the Sixth Amendment right to a jury. It makes no attempt to explain, distinguish, or limit Witherspoon.... [T]he sum of Spaziano's Sixth Amendment analysis is merely that (a) the principal issue in capital sentencing is essentially the same as ordinary sentencing, and (b) there has never been a right to a jury for ordinary sentencing.”).

. See Proffitt, 428 U.S. at 252, 96 S.Ct. 2960 ("[I]t would appear that judicial sentencing should lead, if anything, to even greater consistency in the imposition at the trial court level of capital punishment, since a trial judge is more experienced in sentencing than a jury, and therefore is better able to impose sentences similar to those imposed in analogous cases.” (internal citation omitted)).

. See, e.g., Hoffman, supra note 6, at 985-90; Iontcheva, supra note 17, at 356-60. As our own state's experience since Funnan shows, reductions in the role of the jury have not been inspired by any error-reducing motive, but instead to make it easier for the state to obtain a death a sentence, See supra note 143 and accompanying text. Scholars suggest that this has also been a factor in other states’ impingement on juries’ ability to make the ultimate life or death decision. See, e.g., Smith, supra note 48, at 294.

. Douglass, supra note 6, at 2022.

. See Smith, supra note 48, at 364-65 (“Theoretically, capital sentencing proceedings can be disaggregated into two discrete issues: whether the defendant's crime is eligible for the death penalty (aggravation) and, if so, whether the defendant nonetheless lacles the moral culpability necessary for the ultimate sanction (mitigation). In the real world of litigation, however, the two issues are not so neatly divided. Rather, the issue at any capital sentencing hearing is the singular one of whether or not the defendant should be put *473 to death.”); White, supra note 13, at 30 (”[F]rom a functional perspective, the content of the specific aggravating circumstances enumerated in a sentencing statute is not critical. Regardless of the specific aggravating and mitigating circumstances to be determined, the sentencer is required to make an essentially moral judgment as to whether the defendant should live or die. Thus, it may be argued that the capital defendant's right to jury trial should not vary depending on the particular aggravating circumstances to be determined.”); Hoffman, supra note 6, at 982 ("The Court [in Apprendi and Ring] seems balanced on an impossibly difficult saddle-point: if the Sixth Amendment means anything, it must mean that legislatures cannot deprive criminal defendants of their right to a jury trial by the simple artifice of labeling elements as ‘sentencing factors’; yet there seems to be no principled basis upon which to truly distinguish elements from sentencing factors. This dilemma is so sharp that the slightest change of perspective or wording by one or two Justices seems to have a magnified effect on the outcomes in these cases.”); id. at 1000 ("Of course, the very reason Apprendi leads to the threshold of jury sentencing is because of the impossible distinctions it forces the system to make between the jury’s role in deciding 'elements’ and the judge's role in deciding 'sentencing factors.’ ").

.See Douglass, supra note 6, at 1972-73 ("Unitary capital trials were,pie norm when the Sixth Amendment was created.... Bifurcation — separating the guilt determination from the choice of an appropriate penalty— was a procedure that evolved after the founding, initially for noncapital sentencing. Bifurcation spread as popular resistance to the death penalty and the corresponding rise of a prison system gave judges new options and new powers in fixing sentences. Bifurcation came to capital cases quite late in our history, primarily in response to the Court’s Eighth Amendment decisions in the mid-1970s, My point in reviewing this history is not that bifurcation is a bad idea, nor that we must try capital cases today as we did in 1791. My point is simply that the separation of trial from capital sentencing is a post-constitutional idea that was born from a movement away from capital punishment, not as a means to implement it. We cannot assume, as the Court seems to have done, that separation of trial and sentencing is part of the natural order of things, or that the ‘trial rights’ of the Sixth Amendment were conceived with such a separation in mind.”); supra notes-52, 96, 218 and accompanying text.

. See Eddings, 455 U.S. at 117, 102 S.Ct. 869; Gregg, 428 U.S. at 206-07, 96 S.Ct. 2909.

. See supra note 240 and accompanying text.

. See Furman, 408 U.S. at 449, 92 S.Ct. 2726 (Powell, J., dissenting) (quoting McGautha, 402 U.S. at 207, 91 S.Ct. 1454); see also *474 Witherspoon, 391 U.S. at 518-22, 88 S.Ct. 1770 (explaining the vital role a jury plays in capital sentencing and holding that a jury that excludes jurors opposed to capital punishment violates the defendant’s Sixth and Fourteenth Amendment right to an impartial sen-tencer); supra note 45 and accompanying text.

. See, e.g., Bell v. Cone, 543 U.S. 447, 454 n.6, 125 S.Ct. 847, 160 L.Ed.2d 881 (2005); United States v. Gabrion, 719 F.3d 511, 533 (6th Cir. 2013); People v. Montour, 157 P.3d 489, 498 (Colo. 2007); Brice, 815 A.2d at 322; see also Jeffrey Abramson, Death-Is-Different Jurisprudence and the Role of the Capital Jury Ohio St. J. Crim. L. 117, 121 (2004).

. See, e.g., Mitchell v. United States, 526 U.S. 314, 327, 119 S.Ct. 1307, 143 L.Ed.2d 424 (1999) (the Fifth Amendment right against compelled self-incrimination extends to sentencing); McConnell v. Rhay, 393 U.S. 2, 3-4, 89 S.Ct. 32, 21 L.Ed.2d 2 (1968) ("[The Sixth Amendment right to counsel extends through sentencing and] must ... be treated like the right to counsel at other stages of adjudication.”).

. See Woodward, 134 S.Ct. at 411 (Sotomayor, dissenting from denial of cert.); Blystone v. Pennsylvania, 494 U.S. 299, 322 n.15, 110 5.Ct. 1078, 108 L.Ed.2d 255 (1990) (Brennan, J., dissenting); see also Douglass, supra note 6, at 2004; Criminal Procedure — Confrontation Clause — Fourth Circuit Finds No Right to Confrontation During Sentence Selection Phase of Capital Trial, 128 Harv. L. Rev. 1027, 1032 (2015); Margery Malkin Koosed, Averting Mistaken Executions by Adopting the Model Penal Code's Exclusion of Death in the Presence of Lingering Doubt, 21 N. Ill. U. L. Rev. 41, 101 (2001).

. See Apprendi, 530 U.S. at 475-76, 120 S.Ct. 2348.

. Compare Harris, 536 U.S. at 565-66, 122 S.Ct. 2406 (finding that juries need only determine any fact that increases a maximum *475 authorized sentence, and not a fact that increases a minimum sentence), with id. at 577-78, 122 S.Ct. 2406 (Thomas, J., dissenting) (arguing that juries must also determine any fact that increases a minimum sentence).

. — U.S. -, 133 S.Ct. 2151, 186 L.Ed.2d 314 (2013) (overruling Harris, 536 U.S. 545, 122 S.Ct. 2406).

. See id, at 2158..

. See id. at 2161.

. See Hurst, 136 S.Ct. at 621-24; Ring, 536 U.S. at 597-609, 122 S.Ct. 2428.

. In concluding this for myself, I again acknowledge that Hurst can be read in different ways, and respect that one of my learned colleagues who concurs in part in the result we reach views Hurst as extending only to those findings that aggravate in favor of a death sentence, and not to those that mitigate against them. Our difference in this respect is not as important as the effect of our shared agreement, which is that findings beyond the mere eligibility stage are necessary before a defendant can be sentenced to death under our statute, and that those findings must be made by a jury under the logic of Hurst. My principle disagreement with my colleague is that I believe that the role of the jury in the death penalty process has long encompassed all the factors bearing on the appropriate punishment, and that frequent references to the role of the jury in exercising its conscience and sense of mercy cannot be explained solely by the jury’s role in deciding facts in the strict sense of'how a crime was committed. Instead, I believe it extended to all factors, including those personal to the defendant, bearing on the jury’s sense of the blame-worthiness of the crime and the fitting punishment for it. See, e.g., Winston, 172 U.S. at 310-12, 19 S.Ct. 212; Witherspoon, 391 U.S. at 528, 88 S.Ct. 1770.

. Blakely, 542 U.S. at 303, 124 S.Ct. 2531 (emphasis in original).

. For example, it is possible to form this gotcha syllogism that has the effect of grounding a holding that a unanimous jury verdict *476 must buttress any death penalty judgment. That would go like this. States cannot make the death penalty the mandatory punishment for any crime. See Woodson, 428 U.S. at 303, 96 S.Ct, 2978. Nor can a state execute a defendant before both the aggravating and mitigating factors are fairly considered, and rationally weighed against each other and the factors that weigh in favor of death are found to outweigh those mitigating against it. See id. at 303-04, 96 S.Ct. 2978; Jurek, 428 U.S. at 271, 96 S.Ct. 2950. As a result, the default penalty will always be life imprisonment, absent a specific fact intensive inquiry beyond the stage where guilt and even death eligibility is the sole factor. See Marsh, 548 U.S. at 179, 126 S.Ct. 2516. Thus, as this would go, when you put together all the Supreme Court cases, a jury must now determine whether any defendant should get the death penalty.

.See, e.g., Hoffman, supra note 6; Iontche-va, supra note 17; Sam ICamin & Justin Marceau, The Facts About Ring v. Arizona and the Jury's Role in Capital Sentencing, 13 U. Pa, J, Const. L. 529 (2011); Betrall L. Ross II, Reconciling the Booker Conflict: A Substantive Sixth Amendment in a Real Offense Sentencing System, 4 Cardozo Pub. L. Pol'y & Ethics J. 725 (2006).

. 548 U.S. 163, 126 S.Ct. 2516.

. Id. at 178-79, 126 S.Ct. 2516; see also Sattazahn v. Pennsylvania, 537 U.S. 101, 110, 123 S.Ct. 732, 154 L.Ed.2d 588 (2003).

. This, of course, is exactly why several Justices have focused on death eligibility factors being considered as an element of a crime, and that the jury right only extends to having the jury decide all the facts necessary to make a defendant eligible to be executed. They rationalize this by saying that all are on notice of the criminal laws, and if the criminal laws say that if you do X crime, the range of punishment is Y, then your jury trial right is fully preserved if you are not exposed to Y until a jury says you should be. See supra note 218 (discussing Justice Scalia’s view on this *477 point); see also Hoffman, supra note 6, at 976-77.

. See, e.g., Hoffman, supra note 6, at 1009-10 (advocating for jury sentencing in capital cases without the arbitrary sentencing in death cases that existed before Furman).

. See, e.g., Ring, 536 U.S. at 610, 122 S.Ct. 2428 (Scalia, J., concurring) (‘‘What compelled Arizona (and many other States) to specify particular ‘aggravating factors’ that must be found before the death penalty can be imposed was the line of this Court’s cases beginning with Furman v. Georgia. In my view, that line of decisions had no proper foundation in the Constitution. I am therefore reluctant to magnify the burdens that our Furman jurisprudence imposes on the States. Better for the Court to have intended an evi-dentiary requirement that a judge can find by a preponderance of the evidence, than to invent one that a unanimous jury must find beyond a reasonable doubt.”); see also Lill-quist, supra note 6.

. See supra note 240 and accompanying text.

. See, e.g., South Dakota v. Dole, 483 U.S. 203, 207-08, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987) (establishing five-part test for determining when Congress’s conditional spending is Constitutional); Tinker v. Des Moines Indep. Sch. Dist. 393 U.S. 503, 509, 89 S.Ct. 733, 21 *478 L.Ed.2d 731 (1969) (establishing "Tinker test” for determining whether a school’s censuring speech violates the First Amendment).

. See, e.g., Crawford v. Washington, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) (reformulating test for determining whether hearsay statements are admissible under the Sixth Amendment’s Confrontation Clause); Illinois v. Gates, 462 U.S. 213, 230-39, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (establishing test for determining when probable cause exists under Fourth Amendment).

. See Spaziano, 468 U.S. at 484, 104 S.Ct. 3154 (Stevens, J., dissenting) ("[T]he lesson history teaches is that the jury — and in particular juty sentencing — has played a critical role in ensuring that capital punishment is imposed in a manner consistent with evolving standards of decency. This is a lesson of constitutional magnitude, and one that was forgotten during the enactment of the Florida statute.”); supra note 216 and accompanying text.

. Douglass, supra note 6, at 1974; see also id. at 2012-15; Lillquist, supra note 6, at 650; Hoffman, supra note 6, at 964.

. Adriaan Lanni, Jury Sentencing in Non-capital Cases: An Idea Whose Time Has Come (Again)?, 108 Yale L.J. 1775, 1800 (1999).

. James Wilson, Lectures of James Wilson, in 2 Collected Works of James Wilson 1008-09 (Kermit L. Hall & Mark David Hall, eds., 2007)

. See Hurst, 136 S.Ct. at 624 (Breyer, J., concurring); Schriro, 542 U.S. at 360, 124 S.Ct. 2519 (Breyer, J., dissenting); Ring, 536 U.S. at 619, 122 S.Ct. 2428 (Breyer, J., concurring); Harris, 513 U.S. at 515-16, 519-20, 115 S.Ct. 1031 (Stevens, J., dissenting); Patten v. Florida, 474 U.S. 876, 876, 106 S.Ct. 198, 88 L.Ed.2d 167 (1985) (Marshall, J., dissenting from denial of cert.); Spaziano, 468 U.S. at 477-81, 104 S.Ct. 3154 (Stevens, J., dissenting); see also Gillers, supra note 70, at 39-74.

. As amicus points out, the requirement of a unanimous jury was settled as of the time of our founding as a nation. See C. H. Houston Br. at 4-5; see also 1 John Adams, A Defence of the Constitutions of Government of the United States of America 376 (1797) (“[I]t is the unanimity of the jury that preserves the rights of mankind...James Wilson, The Works of the Honourable James Wilson, L.L.D. 350 (1804) ("To the conviction of a crime, the undoubting and the unanimous sentiment of the twelve jurors is of indispensable necessity. ... [T]he consequence unquestionably is, that a single doubt or single dissent must produce a verdict of acquittal.”); Claudio v. State, 585 A.2d 1278, 1301 (Del. 1991) (“[Ujnanimity of the jurors is required to reach a verdict since such was the common law rule.”).

. See Parker v. Dugger, 498 U.S. 308, 314, 111 S.Ct. 731, 112 L.Ed.2d 812 (1991).

. The Delaware statute in its current form also has another potential problem, which is related to these two points. That is, it distances the role of the jury from the actual decision about life or death, by stating the juty only has to make a-finding of whether a certain aggravator exists and whether the aggravating factors outweigh the mitigating factors, under a preponderance standard. An academic study of the reflections of actual jurors in eight Delaware death penalty cases found that Delaware's approach of having the jurors simply vote on whether the aggravating or mitigating factors predominate had the effect of distancing jurors from having a sense of responsibility that their vote was actually one about life or death. The scholars believed the data “suggest[ed] that capital jurors in Delaware are not taking their sentencing responsibilities seriously” and “take mental strides to effectively distance themselves as much as possible from the sentencing decision." Kleinstuber, supra note 205, at 340; see also id. at 325 ("Further divesting Delaware capital jurors of a sense of responsibility for their decisions, they are not actually asked whether or not the defendant should be sentenced to death.”). For these reasons, it is arguable under the Sixth Amendment that a jury must deliver a sentencing verdict, in which it specifically imposes either a death sentence or the altera-tive prison sentence. Either that, or the jury must be told that it always has an option to exercise mercy and that if its sense of mercy counsels for the less harsh penalty, it may and should find that the mitigators outweigh the aggravators. Consistent with that, the *480 jury should also have to be told that a finding that the aggravators outweigh the miti-gators means the jury believes that death should be the defendant’s penally.

. See Capano v. State, 889 A.2d 968, 978 (Del. 2006); Claudio v. State, 585 A.2d 1278, 1301 (Del. 1991).

. See supra notes 27, 42 and accompanying text.

. See Smith, supra note 48, at 244 ("More than four decades of social science research indicates that unanimous juries deliberate longer, discuss and debate the evidence more thoroughly, and are more tolerant and respectful of dissenting voices. Non-unanimous decision rules also tend to promote perilous racial dynamics.”); see also Zylstra, 1 S.C.L. (1 Bay) at 389 ("[Wjhen the rights of the citizens are to be determined on by 12 men, changed at every Court, and indiscriminately drawn from every class of their fellow citizens, there will be a better chance generally, that the poor will receive an equal measure of justice with the rich, and that the decision of facts will be according to the truth of them.”).

. The unanimity requirement has long been celebrated as an important protective safeguard for a defendant’s rights, precisely because it makes every voice in the juiy room of critical importance, and thereby has been seen as ensuring that the ultimate outcome is a good proxy for how the larger community would decide the matter if that were feasible. See Andres, 333 U.S. at 761-65, 68 S.Ct. 880 (Frankfurter, J., concurring). See generally Jeffrey Abramson, We, The Jury (2004). For the obvious reason that eliminating the unanimity requirement reduces the importance of individual jurors and the incentive for the jury to deliberate in an inclusive manner because the agreement of every juror is no longer necessary to reach an outcome, it is unsurprising that scholars have developed empirical evidence that they believe demonstrates that non-unanimous jury statutes diminish the voice of minority jurors and produce results that seem to reflect greater racial bias. See, e.g,, Kim Taylor-Thompson, Empty Votes in Jury Deliberations, 113 Harv. L. Rev. 1261 (2000); Robert J. Smith, The Geography of the Death Penalty and Its Ramifications, 92 B.U. L. Rev. 227 (2012). Among those studies is one that noted that "Delaware has the highest death-sentencing rate in the country in black defendant/white victim cases.” Hans et al, supra note 36, at 72.

.I acknowledge the odd cases of Apodaca v. Oregon, 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972), and Johnson v. Louisiana, 406 U.S. 356, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972), in which the U.S. Supreme Court held that the Sixth Amendment applies differently to the federal government than to the states. That rationale, I confess, is not convincing to me, and I do not believe that the Supreme Court would allow a state to depart from unanimity in the death penalty context. See McDonald v. City of Chicago, 561 U.S. 742, 765, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010) (plurality) (“[Ijncorporated Bill of *481 Rights protections ‘are all to be enforced against the States under" the Fourteenth Amendment according to the same standards that protect those personal rights against federal enforcement.’ ”) (quoting Malloy v. Hogan, 378 U.S. 1, 10, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964)); see also id. at 823, 130 S.Ct. 3020 (Thomas X, joining plurality opinion and concurring) ("Section 1 [of the Fourteenth Amendment] protects the rights of citizens 'of the United States’ specifically. The evidence overwhelmingly demonstrates that the privileges and immunities of such citizens included individual rights enumerated in the Constitution. ...”).

. See Linda E. Carter, A Beyond a Reasonable Doubt Standard in Death Penalty Proceedings: A Neglected Element of Fairness, 52 Ohio St. L.J. 195, 204-05 (1991); Erik Lillquist, Absolute Certainty and the Death Penalty, 42 Am. Crim. L. Rev. 45, 47-53 (2005).

. See supra notes 17-19 and accompanying text (jury’s historical role in acquitting guilty defendants they believed should not suffer death when that was the penalty); supra notes 20t23 and accompanying text (degrees of murder and lesser included offenses arose in part to give the jury an option to convict a defendant of a lesser crime when guilty of a first degree murder for which death was the mandatory penalty, when they could not reach an agreement unanimously and beyond a reasonable doubt that death was the fitting punishment).

. See United States v. Gabrion, 648 F.3d 307, 325-26 (6th Cir. 2011), rev'd en banc, 719 F.3d 511 (6th Cir. 2013); Carter, supra note 301, at 215-21.

. In so concluding, I acknowledge that ;•post-Furman case law does not apply the beyond a reasonable doubt standard, to the ultimate sentencing phase of a capital trial, and that this Court's own decision in State v. Cohen took that approach. See Cohen, 604 A.2d at 850-52. I also acknowledge that the U.S. Supreme Court has recently suggested that freighting a sentencing inquiry with a specific standard of review is inconsistent with the discretionary nature of sentencing. See Carr, 136 S.Ct. at 642. But, the reality is that American law has long required that certain decisions be made with a high level of confidence. In family law, for example, our state requires a determination that parental rights should be terminated to be made under a clear and convincing standard. See Bair v. Div. Fam. Servs., 974 A.2d 88, 94 (Del. 2009). And in the death penalty context itself, several states in fact sensibly direct that any death sentence be imposed only when the jury is convinced beyond a reasonable doubt that execution is the just sentence. See, e.g., Ark. Code Ann. § 5-4-603 (West 2016); Utah Code Ann. § 76-3-207 (West 2016).

. -U.S. -, 136 S.Ct. 616, 193 L.Ed.2d 504(2016).

. 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

. Spaziano, 468 U.S. at 464, 104 S.Ct, 3154.